**No. 25-297**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

YINTAO YU,

*Plaintiff-Appellant*

v.

BYTEDANCE INC., ET AL.,

*Defendants-Appellees*.

On Appeal from United States District Court
for the Northern District of California,
No. 3:23-cv-04910-SI
Hon. Susan Illston

## PLAINTIFF-APPELLANT'S OPENING BRIEF

BRYAN CAFORIO (CA 261265)
bcaforio@susmangodfrey.com
JESSE-JUSTIN CUEVAS (CA 307611)
jcuevas@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

TANNER LAICHE (CA 344342)
tlaiche@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

*Counsel for Plaintiff-Appellant Yintao Yu*

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT.......................................................................1

II.    JURISDICTIONAL STATEMENT ...............................................................2

III.   ISSUES PRESENTED FOR REVIEW ..........................................................3

IV.    STATEMENT OF THE CASE........................................................................3

     A.    Facts Regarding Appellant's Employment Claims Against ByteDance...........................................................................................3

          1.    Mr. Yu enters certain agreements with ByteDance...................3

          2.    Mr. Yu blows the whistle in October 2017 ..............................7

          3.    Mr. Yu again blows the whistle in December 2017 ..................9

          4.    ByteDance terminates Mr. Yu in retaliation for protected activity ........................................................................10

     B.    Mr. Yu's Efforts to Pursue His Employment Claims ........................11

     C.    The District Court Questions its Jurisdiction Under the Convention........................................................................................13

     D.    Contentious Discovery and ByteDance's Motion for Sanctions..........................................................................................15

V.     SUMMARY OF THE ARGUMENT ...........................................................17

VI.    ARGUMENT.................................................................................................19

     A.    The District Court Lacked Subject Matter Jurisdiction Under the Convention....................................................................................19

          1.    No arbitration agreement relates to this action........................20

          2.    Neither the ECIAA nor the Ancillary Agreements fall under the Convention ...............................................................28

     B.    The District Court's Order Is Likely Interlocutory Under 9 U.S.C. § 16(b)..................................................................................39

VII.   CONCLUSION..............................................................................................42

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Info. Mgmt. of Hawaii, LLC v. Shred-It Am., Inc.*,
2010 WL 4642045 (D. Haw. Nov. 2, 2010)......................................................38

*Aggarao v. MOL Ship Mgmt. Co.*,
675 F.3d 355 (4th Cir. 2012).............................................................................25

*Al-Qarqani v. Chevron Corp.*,
8 F.4th 1018 (9th Cir. 2021)..............................................................................25

*Allied Indus. & Serv. Workers Int'l Union v. Wise Alloys, LLC*,
807 F.3d 1258 (11th Cir. 2015)..........................................................................41

*Armstrong v. NCL (Bahamas) Ltd.*,
998 F. Supp. 2d 1335 (S.D. Fla. 2013) ..............................................................38

*AT&T Technologies, Inc. v. Commc'ns Workers*,
475 U.S. 643 (1986) ...........................................................................................23

*Beiser v. Weyler*,
284 F.3d 665 (5th Cir. 2002)........................................................................20, 21

*Bergesen v. Joseph Muller Corp.*,
710 F.2d 928 (2d Cir. 1983)........................................................................36, 37

*Brown v. Pac. Life Ins. Co.*,
462 F.3d 384 (5th Cir. 2006)..............................................................................41

*Bushley v. Credit Suisse*,
360 F.3d 1194 (9th Cir. 2004)............................................................................41

*Carbajal v. CWPSC, Inc.*,
245 Cal. App. 4th 227 (2016).......................................................................31, 32

*Catlin v. United States*,
324 U.S. 229 (1945) ...........................................................................................40

*Cerner Middle E. Ltd. v. Belbadi Enters., LLC*,
939 F.3d 1009 (9th Cir. 2019).....................................................................20, 21

*Citizens Bank v. Alafabco, Inc.*,
   539 U.S. 52 (2003) ................................................................29

*Czarina, LLC v. W.F. Poe Syndicate*,
   358 F.3d 1286 (11th Cir. 2004) ............................................25

*Day v. Orrick, Herrington & Sutcliffe, LLP*,
   42 F.4th 1131 (9th Cir. 2022) ...............................................20

*Dees v. Billy*,
   394 F.3d 1290 (9th Cir. 2005) .......................................2, 39, 40

*Diaz v. Macys Stores, Inc.*,
   101 F.4th 697 (9th Cir. 2024) ...............................................41

*Gaus v. Miles, Inc.*,
   980 F.2d 564 (9th Cir. 1992) ................................................19

*Glob. Bldg. Prods. Ltd. v. Chemco, Inc.*,
   2012 WL 5183629 (W.D. Wash. Oct. 18, 2012) ...................29

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
   561 U.S. 287 (2010) .............................................................23

*Green Tree Financial Corp.-Alabama v. Randolph*,
   531 U.S. 79 (2000) .........................................................40, 41

*Gunn v. Minton*,
   568 U.S. 251 (2013) .............................................................19

*Hawkins v. KPMG LLP*,
   423 F. Supp. 2d 1038 (N.D. Cal. 2006) ....................21, 24, 26, 27

*Indus. Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH*,
   141 F.3d 1434 (11th Cir. 1998) ............................................33

*Infuturia Glob. Ltd. v. Sequus Pharms., Inc.*,
   631 F.3d 1133 (9th Cir. 2011) .........................................20, 21

*Int'l All. of Theatrical Stage Emp. v. InSync Show Prods., Inc.*,
   801 F.3d 1033 (9th Cir. 2015) .........................................*passim*

*Jack v. Ring LLC*,
   91 Cal. App. 5th 1186 (2023) ...............................................23

*John Zhang v. Dentons U.S. LLP*,
   2021 WL 2392169 (C.D. Cal. June 11, 2021) ...................................................38

*Jones v. Sea Tow Servs.*,
   30 F.3d 360 (2d Cir. 1994)..................................................................38, 39

*LaPine v. Kyocera Corp.*,
   2008 WL 2168914 (N.D. Cal. May 23, 2008) ...................................................30

*Matabang v. Carnival Corp.*,
   630 F. Supp. 2d 1361 (S.D. Fla. 2009) ......................................................37, 38

*MediVas, LLC v. Marubeni Corp.*,
   741 F.3d 4 (9th Cir. 2014)..................................................................41

*Ministry of Def. of Islamic Rep. of Iran v. Gould Inc.*,
   887 F.2d 1357 (9th Cir. 1989).............................................................28, 32

*Mullen Techs., Inc. v. Qiantu Motor (Suzhou) LTD.*,
   2020 WL 3573371 (S.D. California July 1, 2020)...........................................29

*N. Motors, Inc. v. Knudsen*,
   2011 WL 2552573 (E.D. Mo. June 27, 2011)................................................33

*Padilla Ayala v. Teledyne Def. Elecs.*,
   533 F. Supp. 3d 920 (C.D. Cal. 2021).................................................*passim*

*Pineda v. Sun Valley Packing, L.P.*,
   2021 WL 5755586 (E.D. Cal. Dec. 3, 2021)................................31, 32, 35, 38

*R3 Aero. v. Marshall of Cambridge Aero.*,
   927 F. Supp. 121 (S.D.N.Y. 1996).....................................................24, 26, 27

*Reg'l Local Union No. 846 v. Gulf Coast Rebar, Inc.*,
   736 Fed. Appx. 666 (9th Cir. 2018) .......................................................41

*Rincon Band of Mission Indians v. San Diego Cnty.*,
   495 F.2d 1 (9th Cir. 1974)..................................................................15

*Rogers v. Royal Caribbean Cruise Line*,
   547 F.3d 1148 (9th Cir. 2008)..............................................................29

*SanDisk Corp. v. SK Hynix Inc.*,
   84 F. Supp. 3d 1021 (N.D. Cal. 2015) ...............................................21, 26, 27

*Sarhank Grp. v. Oracle Corp.*,
  404 F.3d 657 (2d Cir. 2005)..................................................................25

*Sauk-Suiattle Indian Tribe v. City of Seattle*,
  56 F.4th 1179 (9th Cir. 2022)...................................................3, 20, 40

*Shamrock Oil & Gas Corp. v. Sheets*,
  313 U.S. 100 (1941) ...............................................................................19

*Smoller v. Deutsche Bank AG*,
  2006 WL 2129792 (E.D. Mo. July 31, 2006) ...............................36, 38

*Southland Corp. v. Keating*,
  465 U.S. 1 (1984) ....................................................................................29

*United States v. Cotton*,
  535 U.S. 625 (2002) ...............................................................................15

*United States v. Morrison*,
  529 U.S. 598 (2000) ...............................................................................29

*United States v. Orr Water Ditch Co.*,
  600 F.3d 1152 (9th Cir. 2010)...............................................................19

*Wallrich v. Samsung Elecs. Am., Inc.*,
  106 F.4th 609 (7th Cir. 2024).................................................................41

*Wilson v. Lignotock U.S.A., Inc.*,
  709 F. Supp. 797 (E.D. Michigan, 1989) ............................................38

*Zeng v. Ellenoff Grossman & Schole LLP*,
  2024 WL 4451605 (S.D.N.Y. Apr. 10, 2024)........................................34

**Statutes**

9 U.S.C. § 3 ....................................................................3, 19, 40, 42

9 U.S.C. § 4 ....................................................................................*passim*

9 U.S.C. § 16 ..................................................................................*passim*

9 U.S.C. § 202 ................................................................................*passim*

9 U.S.C. § 203 ........................................................................................15, 42

9 U.S.C. § 205 ................................................................................*passim*

9 U.S.C. § 207 ............................................................................24, 25, 26

18 U.S.C. § 922 ........................................................................................34

20 U.S.C. § 1091 ......................................................................................34

26 U.S.C. §§ 1, 7701(b) ...........................................................................34

28 U.S.C. § 1291 ............................................................................2, 3, 40

28 U.S.C. § 1331 ..................................................................................2, 15

28 U.S.C. § 1332 ........................................................................2, 33, 34

50 U.S.C. § 3802 ......................................................................................34

Cal. Civ. Proc. Code § 987 ................................................................*passim*

Cal. Civ. Proc. Code § 1060 ..............................................................12, 22

Cal. Gov't Code §12900 ....................................................................11, 12

California Labor Code § 2870 .............................................................5, 36

## I.    PRELIMINARY STATEMENT

Plaintiff-Appellant Yintao Yu ("Appellant" or "Mr. Yu") blew the whistle on Defendant-Appellee ByteDance, Inc. ("ByteDance")—the company that owns and operates the social media platform TikTok—for its global data-security violations and content theft scheme, opposing disability discrimination, and returning from protected medical leave. Shortly after, he was fired. This is the third lawsuit arising from that unlawful termination. But unlike the earlier two suits, which challenged ByteDance's unlawful retaliation and discrimination head-on, this case raises a single, threshold question: Did Mr. Yu sign an alleged Employee Confidentiality and Inventions Assignment Agreement ("ECIAA") that ByteDance claims contains a binding arbitration clause? ByteDance and co-Appellee-Defendant Shuyi "Selene" Gao ("Gao" and, together with ByteDance, "Appellees") twice removed Mr. Yu's earlier substantive lawsuits to federal court and moved to compel arbitration. Mr. Yu filed this declaratory judgment action in state court, asking only whether the ECIAA—with its alleged arbitration clause—was ever executed. Appellees now seek to turn that simple issue of contract formation into a federal case.

Mr. Yu's pending discrimination and wrongful termination claims have substantial merit, but procedural missteps and poor legal advice in the declaratory judgment action led to terminating sanctions. Appellees will no doubt exploit that collateral issue on appeal. That is a distraction. This appeal presents a clean, legal

1

question: whether Appellees' third removal, invoking for the very first time the Federal Arbitration Act ("FAA") and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention"), properly conferred subject matter jurisdiction. It did not. This Court should thus vacate and remand to state court, where this case belongs.

## II.     JURISDICTIONAL STATEMENT

This appeal is taken from a December 12, 2024, order of the U.S. District Court for the Northern District of California compelling arbitration and staying proceedings. 1-ER-002. There is mixed Ninth Circuit authority as to whether such an order is final and immediately appealable. *Compare Int'l All. of Theatrical Stage Emp. v. InSync Show Prods., Inc.*, 801 F.3d 1033, 1040 (9th Cir. 2015) *with Dees v. Billy*, 394 F.3d 1290, 1294 (9th Cir. 2005); *see also* 28 U.S.C. § 1291; 9 U.S.C. § 16(a)(3) & (b)(1). On January 13, 2025, Mr. Yu timely filed a notice of appeal within the time period prescribed by the federal appellate rules "out of an abundance of caution to preserve appellate rights," explicitly noting his belief that the order was interlocutory. 4-ER-579 n.1.

This appeal challenges the district court's subject matter jurisdiction to adjudicate the case under 28 U.S.C. §§ 1331 and 1332, the FAA, and the Convention, including 9 U.S.C. § 205. Whether the district court properly exercised subject

2

matter jurisdiction presents a question of law reviewed *de novo*. *Sauk-Suiattle Indian Tribe v. City of Seattle*, 56 F.4th 1179, 1184 (9th Cir. 2022).

## III.    ISSUES PRESENTED FOR REVIEW

1.    Whether a federal court has jurisdiction under the Convention, 9 U.S.C. § 205, over a declaratory judgment action involving state contract formation claims relating to a non-commercial agreement between a U.S. corporation and legal permanent resident ("LPR") that does not contemplate performance abroad and is domestic in scope.

2.    Whether an order compelling arbitration and staying proceedings is final and immediately appealable under 28 U.S.C. § 1291 and 9 U.S.C. § 16, where the case concerns declaratory judgment claims and the defendant requested a stay pursuant to 9 U.S.C. § 3.

## IV.    STATEMENT OF THE CASE

### A.    Facts Regarding Appellant's Employment Claims Against ByteDance

#### 1.    Mr. Yu enters certain agreements with ByteDance

Mr. Yu is a highly skilled computer expert with extensive experience in the technology sector. 2-ER-068–69. Mr. Yu has held roles at multiple prominent tech companies, and even founded his own company, Tank Exchange, Inc., a venture-backed technology startup in the Stanford-StartX accelerator at Stanford University. *Id*. Mr. Yu is a citizen of China, but he has been a legal permanent resident (LPR)

3

of the United States since 2015, domiciled in California that entire time. 2-ER-020, 198; 3-ER-400–01. He also became a naturalized U.S. citizen earlier this year.

Defendant ByteDance is a Delaware corporation with a principal place of business in San Francisco, California. 2-ER-068. ByteDance operates social media platforms such as TikTok. 3-ER-483. ByteDance conducts substantial business from its San Francisco-area offices, and the majority of its executive and administrative functions are performed in California. 2-ER-068.

In or around June 2017, ByteDance hired Mr. Yu to be the U.S. head of engineering. *Id*. Mr. Yu was hired to work out of ByteDance's California offices. 3-ER-483. Mr. Yu's work for ByteDance primarily related to social media platforms. *Id.*

At or around the time Mr. Yu formally began his work for ByteDance in August 2017, ByteDance requested he travel to Beijing, China to meet with ByteDance executives, start his onboarding training, and get familiar with the company's culture. *Id.*

ByteDance claims that on August 30, 2017, while in China Mr. Yu signed an Employee Confidentiality and Inventions Assignment Agreement (ECIAA), which placed restrictions on his "right to disclose or use … certain information and technology learned … during [his] employment." 3-ER-329, 404, 528. Mr. Yu disputes that he was ever presented with, or signed, an ECIAA. 3-ER-507–08.

4

The ECIAA ByteDance produced in this case has serious authenticity and reliability issues. 3-ER-507–08. For example, discovery showed that the ECIAA was first prepared by ByteDance's external legal counsel in *September* 2017 and did not even exist on August 30, 2017, when Mr. Yu purportedly signed it. 2-ER-139–41. Also, ByteDance did not countersign the document, and Mr. Yu's purported signatures appearing on the ECIAA are noticeably pixelated and of lower resolution than the remainder of the document. 3-ER-541–43.

Putting aside the authenticity issues, the purported ECIAA was a supplementary agreement separate and apart from Mr. Yu's formal employment contract. *Compare* 3-ER-528 *with* 3-ER-523. It is also a California-centric document. It is between ByteDance (a U.S. corporation in California) and Mr. Yu (a 10-year LPR and now naturalized citizen domiciled in California). 3-ER-528. It is conspicuously labeled on the first page "For California Employees" and repeatedly refers to California statutes, including Labor Code § 2870 and Civil Code § 987. 3-ER-528, 535. It also purportedly calls for arbitration in Los Angeles County, California, and is "governed" in accordance "with the laws of California." 3-ER-538. Importantly, the ECIAA's arbitration provision narrowly applies to disputes "arising out of or relating to or resulting from Employee's employment with Employer." *Id.*

As part of his employment compensation, Mr. Yu also received an option to acquire shares in ByteDance. 3-ER-546. The Stock Option Award Agreement ("Stock Agreement") was issued in or around September 2017 by ByteDance's parent company, ByteDance, Ltd. ("BDL"). *Id*. BDL is a Cayman Islands holding entity with substantial operations and presence in the U.S. 2-ER-262; 3-ER-549. The Stock Agreement called for arbitration before the Hong Kong International Arbitration Centre ("HKIAC") for disputes "arising out of or relating to the [Notice of Stock Option Award] the [Company's 2012 Stock Incentive Plan], or this [Stock Option Award Agreement]." 3-ER-555.

As part of the acquisition-hire of Mr. Yu, ByteDance acquired patent applications owned by Mr. Yu's former company, Tank Exchange, Inc., for $600,000. 3-ER-554. The resulting Patent Assignment Agreement ("Patent Agreement") was executed on August 22, 2017, by two U.S.-based entities—Tank Exchange and ByteDance—both domiciled in California. 3-ER-566. The Patent Agreement concerns a U.S. patent application (No. 14/918,279) filed under U.S. patent law, denominates payment in U.S. dollars, and requires that payment be made to a U.S. bank account in San Francisco. 3-ER-567–70. The Patent Agreement calls for arbitration before the HKIAC for claims "arising out of or relating to [the Patent Agreement]." 3-ER-568.

6

Around the time the Patent Agreement was executed, ByteDance raised concerns about paying the $600,000 without assurances of Mr. Yu's continued service. 2-ER-069. ByteDance pressured Mr. Yu into signing a supplemental two-year fixed-term employment agreement to ensure his continued employment at ByteDance ("Supplemental Employment Agreement"). *Id*. This fixed-term agreement superseded the "at will" provision contained in the ECIAA. *Id*. The employment relationship was set to last until August 2019, unless Mr. Yu was terminated "for cause." *Id*. Mr. Yu signed the Supplemental Employment Agreement in 2017, and ByteDance promised, but failed, to provide him a copy. 2-ER-070.

Years later, when the parties were embroiled in litigation, ByteDance submitted an unsigned "Undertaking Agreement" and claimed that unsigned agreement is the signed Supplemental Employment Agreement. 3-ER-575. It is not. Notably, that Undertaking Agreement did not exist in Mr. Yu's personnel file, which ByteDance provided to him in 2019. 2-ER-160, 3-ER-364. The (unsigned) Undertaking Agreement calls for arbitration before the HKIAC only for disputes "arising out of or relating to [the Undertaking Agreement]." 3-ER-575.

### 2. Mr. Yu blows the whistle in October 2017

As the operating company of many social media platforms, including TikTok—now the world's leading short-form video platform with hundreds of millions of users globally—ByteDance shapes the online content consumed by vast

7

portions of the global population. Shortly after starting at ByteDance in August 2017, however, Mr. Yu uncovered a brazen, years-long scheme to illegally harvest and monetize the online creative work of others. 2-ER-070–73. Mr. Yu discovered that ByteDance had unlawfully engineered and deployed sophisticated scraping tools to systematically extract videos and images from competing platforms—primarily Instagram and Snapchat—without consent, license, or legal right. 2-ER-070–72. The stolen content was then laundered through fake social media accounts and republished on ByteDance's platforms to artificially boost engagement metrics and deceive users about the popularity and authenticity of its content. *Id.*

At the same time Mr. Yu also discovered a second, equally alarming scheme: a coordinated effort to fabricate user engagement and manipulate the company's growth metrics. 2-ER-072–73. ByteDance was artificially inflating its core performance indicators—daily active users, retention rates, and interaction levels—by generating fake accounts through automated scripts and internal tools. *Id.* Mr. Yu observed bots liking, following, and sometimes commenting on real users' content. *Id.* These interactions triggered push notifications—e.g., "User123 liked your video" or "New follower!"—which were calculated to draw users back to the platform and keep them engaged. *Id.* This manufactured activity created a false sense of popularity and virality, which resulted in a self-reinforcing illusion of growth that ByteDance used to court investors and advertising partners. *Id.*

8

Mr. Yu was alarmed by ByteDance's unlawful content-scraping and user fabrication. As early as October 2017, Mr. Yu raised these concerns with Wenjia Zhu, then ByteDance's Senior Vice President of Engineering and later its Global TikTok R&D Chief. 2-ER-071, 073. Rather than addressing the issue, Mr. Zhu dismissed the concerns, telling Mr. Yu it was not a big deal and the practices would help boost ByteDance's engagement metrics. 2-ER-071. Simultaneously, Mr. Zhu instructed Mr. Yu to conceal the scheme because U.S. law imposed stricter intellectual property protections and the scheme risked class-action exposure for ByteDance. *Id*. Ultimately Mr. Yu's complaints went ignored and ByteDance's misconduct continued unabated. 2-ER-070–73.

### 3.     Mr. Yu again blows the whistle in December 2017

In or around December 2017, Mr. Yu learned that ByteDance planned to fire a U.S.-based employee suffering from depression, despite her strong performance and recent request for medical leave. 2-ER-073–74. Although the employee's direct supervisor had rated her as "Meets Expectations," another manager, Ying "Fiona" Zhi, unilaterally and secretly downgraded her review to "Improvement Needed" as a pretext for HR to terminate employment. *Id*. When Mr. Yu confronted Ms. Zhi, she admitted that she did not want the employee taking time off for her mental health, viewed her as a "burden," and believed her "cost of management was too high." 2-ER-073. Ms. Zhi further acknowledged that a termination would have violated

9

company policy unless the employee received a poor review, prompting her to engineer the lower score. 2-ER-073–74.

Mr. Yu raised the issue with the Global Head of HR. 2-ER-074. In. response, Appellee Gao formulated a strategy to conceal the termination's unlawful motive. *Id*. Although ByteDance ultimately backed down after Mr. Yu's intervention, his advocacy did not go unnoticed. The future CEO of ByteDance China later assumed control of Mr. Yu's division and, according to internal sources, resented Mr. Yu's efforts to expose misconduct. *Id.*

### 4. ByteDance terminates Mr. Yu in retaliation for protected activity

In March 2018, Mr. Yu went on medical leave at his doctor's recommendation. 2-ER-076–77. On July 18, 2018, he sent letters to multiple ByteDance supervisors informing them that he expected to return to work on September 11, 2018. 2-ER-076. ByteDance claims it mailed a termination notice eight days later, on July 26, citing a reduction in force, and emailed it to Mr. Yu the following day. 2-ER-076–77. Mr. Yu never received either notice and ByteDance never called him, despite acknowledging receipt of his return-to-work communication. 2-ER-077.

When Mr. Yu was medically cleared and attempted to return, ByteDance refused to reinstate him, telling him not to report to work and that someone would follow up. *Id*. No one did. *Id*. Mr. Yu remained on payroll through November 2018,

and although the first tranche of stock options should have vested in August 2018, ByteDance never vested the shares. *Id*.; 3-ER-546. In November 2018, ByteDance formally terminated Mr. Yu in retaliation. 2-ER-077.

### B. Mr. Yu's Efforts to Pursue His Employment Claims

On July 25, 2019, Mr. Yu filed a complaint of discrimination with California's Department of Fair Employment and Housing pursuant to the California Fair Employment and Housing Act (FEHA), Cal. Gov't Code §12900 et seq. *Id*. Mr. Yu's claims were then tolled as a result of Emergency Rules Related to COVID-19 and the parties' agreement. *Id*.; 3-ER-431.

On November 17, 2022, Mr. Yu—acting *pro se*—filed an initial complaint in San Francisco Superior Court (Case No. CGC-22-603019), alleging whistleblower retaliation and related claims. 3-ER-417. Appellees removed the case to federal court and moved to compel arbitration, relying exclusively on the arbitration clause in the purported ECIAA. *Id*. Critically, Appellees made no mention of the Stock Agreement, Patent Agreement, or Undertaking Agreement (together, "Ancillary Agreements"), each of which it attempts to invoke in this case. 3-ER-417–18. Navigating the complexities of federal procedure *pro se*, Mr. Yu was unable to timely respond to the removal and motion filed in federal court, and the district court dismissed the complaint without prejudice for lack of prosecution. 2-ER-238.

11

After securing legal counsel, Mr. Yu refiled his claims in San Francisco Superior Court (Case No. CGC-23-606246). 3-ER-417. Appellees again removed the case to federal court—this time asserting federal question jurisdiction based only on copyright allegations, not the Convention—and, the very next day, filed another motion to compel arbitration. 3-ER-417–18. Once again, Appellees relied solely on the purported ECIAA to compel arbitration and made no reference to the Ancillary Agreements. *Id*. The district court never ruled on the arbitration motion. It dismissed the copyright claims and remanded the case to state court for lack of federal jurisdiction. 2-ER-261, 271. That case remains pending in California state court to this day, and ByteDance never challenged its remand. 3-ER-314–15.

Because Appellees twice sought to compel arbitration based on an ECIAA that Mr. Yu did not sign, Mr. Yu filed a declaratory relief action in San Francisco Superior Court (Case No. CGC-23-608845) on September 5, 2023. 3-ER-481. The complaint alleged a single cause of action under California Code of Civil Procedure § 1060, seeking a declaration that Mr. Yu never executed the purported ECIAA produced by ByteDance. 3-ER-485.

Undeterred, Appellees removed that case, too—their third removal—and filed a motion to compel arbitration. 3-ER-465. For the first time in any forum, Appellees invoked both the Convention and the Ancillary Agreements as bases for federal jurisdiction. 3-ER-465–73. Appellees summarily characterized the Ancillary

Agreements, which they previously ignored, and the ECIAA as together "provid[ing] sufficient grounds" to uphold removal and enforce arbitration under the Convention. 3-ER-470. But none of the arbitration provisions in these agreements relate to the claim at issue here—a declaratory dispute over contract formation—nor do they otherwise fall within the scope of the Convention.

## C. The District Court Questions its Jurisdiction Under the Convention

From the outset, the district court identified serious inconsistencies in Appellees' litigation strategy and questioned the legitimacy of its sudden invocation of federal jurisdiction under the Convention. On November 28, 2023, the court *sua sponte* ordered the parties to address at an upcoming hearing whether Mr. Yu could "challenge the removal of this case under 9 U.S.C. § 205" and why, in the prior two federal actions, defendants did not "invoke the Stock Option Award Agreement, the Patent Assignment Agreement, and the (unsigned) Undertaking Agreement" as grounds for compelling arbitration. 3-ER-410.

At a December 1, 2023, hearing, Mr. Yu's former counsel directly addressed the Court's concerns. As a preliminary matter, he confirmed that "there are grounds to challenge the removal based on the three [ancillary] contracts," noting that "there's no conceivable connection between those contracts and the issue here, which is simply: Did [Mr. Yu] sign the ECIAA?" 2-ER-019.

13

Turning to the ECIAA, counsel acknowledged that it presented a closer jurisdictional question under the Convention. But even then, he expressed skepticism about the legal basis for removal. *Id*. He candidly noted that his team "didn't feel very confident that we could remove the case"—but never endorsed federal jurisdiction. *Id*. He went on to note:

> There are lots of components about the ECIAA that … are international in nature. It governs international materials. … [W]ith respect to the materials, we're talking about confidential materials or proprietary materials for [BDL] … -- primarily a Chinese company. … And it is true that Mr. Yu, while he is a California resident and his employment was primarily based in California, you know, did travel to China in the course of his employment and probably would have done more traveling had he continued to be employed, you know, by ByteDance …. And so it involves material from abroad, but it also involves conduct abroad. …. It allows ByteDance … to use Mr. Yu, to publicize him anywhere in the world. It expressly says that in its publicity section of the ECIAA.

2-ER-019–21. Based on former counsel's view that the ECIAA had certain international features, he mused that he "couldn't say … that this contract was entirely domestic in scope." 2-ER-021. However, he stopped far short of affirmatively asserting that the ECIAA satisfied the requirements of the Convention or that the district court had removal jurisdiction. 2-ER-019–21.

That was the end of the jurisdictional inquiry. One week after the hearing, the court ordered the parties to file supplemental briefing "address[ing] the enforceability of the other three [ancillary] arbitration agreements," but not whether the ECIAA (or any other agreement) conferred federal jurisdiction over the dispute.

14

3-ER-408–409. The parties then subsequently filed a Joint Case Management Statement asserting that "[t]his Court has original jurisdiction over Plaintiff's complaint under 28 U.S.C. § 1331 and 9 U.S.C. §§ 203 and 205 because it is '[a]n action or proceeding falling under the Convention' and is therefore 'deemed to arise under the laws and treaties of the United States.'" 3-ER-371. But that conclusory assertion was never briefed, never adjudicated, and—most importantly—cannot create jurisdiction where it does not exist. *See* 9 U.S.C. § 203; *Rincon Band of Mission Indians v. San Diego Cnty.*, 495 F.2d 1, 8 (9th Cir. 1974) ("It is hornbook law that jurisdiction of a District Court cannot be stipulated to by the parties, and that the court sua sponte must satisfy itself that jurisdiction exists.").

As a matter of law, the jurisdictional inquiry should not have ended there: Federal courts have an independent and continuing obligation to ensure they possess subject matter jurisdiction, and that obligation cannot be waived, conceded, or bypassed by the parties. *See, e.g.*, *United States v. Cotton*, 535 U.S. 625, 630 (2002) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.").

### D.    Contentious Discovery and ByteDance's Motion for Sanctions

After the hearing, Mr. Yu's declaratory judgment action continued in federal court. During a contentious discovery period, Mr. Yu—in reliance on questionable legal advice—made some serious missteps, derailing the merits of the underlying

case. For example, in a pre-litigation mediation in 2022, Mr. Yu's former counsel submitted an anonymous third-party declaration stating a signed version of the Supplemental Employment Agreement existed. 1-ER-004. The district court ordered Mr. Yu to disclose the declarant's identity and, after a failed motion for reconsideration, Mr. Yu complied. 1-ER-004–05. ByteDance later contacted the declarant and asked her to submit a second, competing declaration disputing the authenticity of the original declaration. 1-ER-005–06. Separately, during deposition ByteDance questioned Mr. Yu on whether he had knowingly signed or authorized a bankruptcy petition. 1-ER-006. Mr. Yu disavowed signing the bankruptcy petition and associated declarations, which ByteDance contended was perjurious. *Id*.

In response to the alleged discovery violations and other procedural complaints, Appellees moved for terminating sanctions. *Id*. The district court held an evidentiary hearing on the motion during which Mr. Yu—in reliance on legal advice from his former counsel—invoked his Fifth Amendment rights. 1-ER-007–08. The court drew adverse inferences from that invocation, including findings that Mr. Yu had "fabricated the anonymous declaration," "submitted a perjurious declaration to this Court," and "committed perjury at his deposition when he denied signing … the bankruptcy [petition]." 1-ER-010–11. Based on these inferences, the court concluded that Mr. Yu had "engaged in serious, bad faith conduct that has abused the judicial process." 1-ER-010. It granted Appellees' motion, compelled

Mr. Yu to arbitration, and stayed the case pending arbitration. 1-ER-013. These discovery-related findings are now part of the record. But they are not the issue before this Court on appeal. This appeal concerns the threshold question of whether the district court had subject matter jurisdiction to resolve the dispute at all. That is an issue the district court failed to fully resolve and one that cannot be waived or overshadowed by other disputes.

On January 13, 2025, Mr. Yu timely filed a notice of appeal "out of an abundance of caution to preserve appellate rights" challenging the district court's order and its subject matter jurisdiction. 4-ER-579 n.1. On January 17, 2025, four days later, this Court *sua sponte* issued an order for the parties to "address the basis for this court's jurisdiction over this appeal." *See* Dkt. 3.

## V.  SUMMARY OF THE ARGUMENT

*First*, the district court did not have subject matter jurisdiction under the Convention, 9 U.S.C. § 205, to issue the order compelling arbitration. The Complaint filed in San Francisco Superior Court sought only a declaration that Mr. Yu did not sign the ECIAA. The arbitration clause of the ECIAA, by its terms, applies to disputes "arising out of or relating to or resulting from Employee's *employment*," not the existence of an auxiliary document. The ECIAA is not Mr. Yu's underlying employment agreement, and a dispute about whether Mr. Yu signed the ECIAA is logically antecedent to, and independent of, his employment. Moreover, issues of

17

contract formation are not proper disputes for arbitration, *e.g.*, 9 U.S.C. § 4, and, therefore, the ECIAA's arbitration provision provides no conceivable defense or basis to compel arbitration. For the same reasons, the arbitration provisions in the Ancillary Agreements—each even more attenuated from the narrow claims at issue—fall outside the scope of the Convention and none cover the sole contract-formation question before the district court.

Moreover, the ECIAA is not a commercial agreement; it lays out boilerplate confidentiality and IP terms, settles internal governance and ownership rights, and lacks any connection to interstate commerce. Nor does it have a sufficient international nexus because it was executed between two U.S. domiciliaries, labeled "For California Employees," governed by California law, and related to Mr. Yu's domestic employment in California. The purported signing of the ECIAA while Mr. Yu was temporarily in China, or that ByteDance operates internationally, does not transform a domestic contract into an international commercial agreement.

Because none of the agreements satisfy the Convention's threshold requirements, the district court lacked removal jurisdiction, and this Court should vacate and remand to state court.

***Second***, Mr. Yu expresses no strong view on whether this Court has appellate jurisdiction, but, as a technical matter, the order was likely interlocutory under 9 U.S.C. § 16(b)(1). Section 16(b)(1) bars interlocutory appeals from orders that

18

compel arbitration and stay, rather than dismiss, the underlying action. While this Court has recognized a narrow exception for courts only "presented with a petition to compel arbitration" under 9 U.S.C. § 4 and "no other claims," *InSync*, 801 F.3d at 1033, that exception does not apply here; Mr. Yu sought declaratory relief and Appellees sought a stay pursuant to 9 U.S.C. § 3. Because the district court's order stayed the case, it is presumably not a final decision under Section 16(a)(3).

## VI. ARGUMENT

### A. The District Court Lacked Subject Matter Jurisdiction Under the Convention

"Federal courts are courts of limited jurisdiction[.]" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (citation omitted). "The party asserting federal jurisdiction"—in this case, Appellees—"has the burden of establishing it." *United States v. Orr Water Ditch Co.*, 600 F.3d 1152, 1157 (9th Cir. 2010) (citation omitted). "Removal statutes are 'strictly construe[d] against removal,' and the removing party bears the burden of overcoming the 'strong presumption against removal jurisdiction.'" *Padilla Ayala v. Teledyne Def. Elecs.*, 533 F. Supp. 3d 920, 923 (C.D. Cal. 2021) (citing *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992)); *see also Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941) (federal courts must "scrupulously confine their own jurisdiction to the precise limits which the statute has defined"). Whether the district court properly exercised subject matter jurisdiction presents a question of law reviewed *de novo*. *Sauk-Suiattle Indian Tribe v*, 56 F.4th at 1184.

19

The FAA grants jurisdiction over actions or proceedings falling under the Convention if: "(1) there is an underlying arbitration agreement or award that falls under the Convention, and (2) the action or proceeding relates to that arbitration agreement or award." *Day v. Orrick, Herrington & Sutcliffe, LLP*, 42 F.4th 1131, 1138 (9th Cir. 2022); s*ee also* 9 U.S.C. § 205. Although the scope of the Convention is broad, it is "not limitless." *Cerner Middle E. Ltd. v. Belbadi Enters., LLC*, 939 F.3d 1009, 1016 (9th Cir. 2019).

Appellees fail to identify an arbitration agreement that both (1) relates to the state declaratory relief claims and (2) falls under the Convention.

### 1. No arbitration agreement relates to this action

An action "relates to" an arbitration agreement when the agreement "could conceivably affect the outcome of the plaintiff's case," such as when the defendant can rely on the agreement to compel arbitration. *Infuturia Glob. Ltd. v. Sequus Pharms., Inc.*, 631 F.3d 1133, 1138 (9th Cir. 2011) (quoting *Beiser v. Weyler*, 284 F.3d 665, 669 (5th Cir. 2002)). Although this standard is broad, it is not without bounds. "[A]rbitration under the [FAA] is a matter of consent, not coercion." *SanDisk Corp. v. SK Hynix Inc.*, 84 F. Supp. 3d 1021, 1030 (N.D. Cal. 2015) (citation omitted). Accordingly, removal under § 205 is improper where the asserted link between the arbitration agreement and the claims is merely tangential, speculative, or otherwise too remote to affect the litigation's outcome. *Id.* at 1035.

20

As this Court has cautioned, "the possibility that some discussion in the [arbitration agreement] might conceivably be perceived as persuasive … cannot be enough by itself, unless there is something unique about the [agreement] being the source of the analysis." *Cerner*, 939 F.3d at 1016. "Indeed, 'without meaningful limit' on the scope of § 205, 'a defendant could obtain federal jurisdiction anytime it is party to an arbitration agreement falling under the Convention, regardless of whether the arbitration provision has anything to do with the issues raised in the state court lawsuit.'" *SanDisk*, 84 F. Supp. 3d at 1030 (citation omitted).

Thus, to satisfy § 205, a defendant must demonstrate a "reasonable possibility" that the arbitration agreement will apply to the claims and could support a motion to compel arbitration. *See Hawkins v. KPMG LLP*, 423 F. Supp. 2d 1038, 1048 (N.D. Cal. 2006); *see also Cerner*, 939 F.3d at 1016; *Infuturia*, 631 F.3d at 1138 (§ 205 does not apply to assertions of jurisdiction that are "absurd or impossible"); *Beiser*, 284 F.3d at 671 (§ 205 does not encompass "frivolous petition[s] for removal"); *SanDisk*, 84 F. Supp. 3d at 1035 (§ 205 does allow removal where the claimed connection "is too remote"). Here, for several independent reasons no such agreement exists.

***First***, this declaratory judgment case is—and always has been—about a single question: Did Mr. Yu sign the ECIAA? Mr. Yu's complaint asserted one cause of action: declaratory and injunctive relief under California law. 3-ER-485; Cal. Civ.

21

Proc. Code § 1060. It does not seek to enforce the ECIAA or any other agreement. To the contrary, it affirmatively denies the existence of the ECIAA and seeks a judicial declaration that no contract was ever formed. 3-ER-485.

Crucially, the arbitration clause of the alleged ECIAA by its terms does not apply to this dispute. Instead, it only applies to disputes "arising out of or relating to or resulting from Employee's employment." 3-ER-538. The underlying dispute—whether Mr. Yu signed the ECIAA in the first place—does not "aris[e] out of or relat[e] to or result[] from" his employment because it concerns the very existence of the agreement, not the terms or performance of the employment relationship. Because Mr. Yu never agreed to arbitrate questions of contract formation, the ECIAA's arbitration provision does not relate to this dispute. *See AT&T Technologies, Inc. v. Commc'ns Workers*, 475 U.S. 643, 648 (1986) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (citation omitted).

Appellees' removal argument hinges entirely on 9 U.S.C. § 205, which allows removal to be based on affirmative defenses in the petition for removal. But even Appellees' petition offers no factual support for jurisdiction. Appellees' sole argument is the conclusory assertion that "all four agreements arise from and are directly related to Yu's original June 2017 employment offer from BDI." 3-ER-470. As a preliminary matter, even if that were true, it conflates the two distinct sets of

22

claims: the employment claims (that were remanded to state court in the prior action and are not at issue here) and the declaratory judgment claims (limited to whether Mr. Yu executed the ECIAA). Moreover, because the ECIAA is not Mr. Yu's underlying employment agreement, Mr. Yu's employment does not presuppose the existence of a valid ECIAA agreement.

**Second**, this dispute is categorically inappropriate for arbitration. Under state and federal law, a court—not an arbitrator—must decide threshold issues concerning contract formation. *See* 9 U.S.C § 4 ("If the making of the arbitration agreement … be in issue, the court shall proceed summarily to the trial thereof."); *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) ("[T]he court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce."); *Jack v. Ring LLC*, 91 Cal. App. 5th 1186, 1197 (2023) ("[C]hallenges to the validity of the arbitration clause itself are generally resolved by the court in the first instance.") (citation omitted). That principle is not optional, it is foundational.

Here, Mr. Yu unequivocally denies ever signing the ECIAA, let alone agreeing to its arbitration clause. That puts the very existence of an arbitration agreement in doubt, making the issue squarely one for judicial resolution. Because disputes over contract formation are categorically non-arbitrable where, as here, one party denies the existence of any arbitration agreement, the district court has no

23

authority to refer the claims to arbitration, regardless of what the parties argue or what the arbitration clause says. Indeed, federal courts have recognized that non arbitrable disputes such as this one do not fall under the Convention because "the Convention, by its own terms, does not apply to non-arbitrable disputes." *R3 Aero. v. Marshall of Cambridge Aero.*, 927 F. Supp. 121, 123 (S.D.N.Y. 1996).

For these reasons, Appellees' reliance on the ECIAA's arbitration provision fails not only on the merits, but as a matter of jurisdiction. The arbitration clause cannot conceivably "affect the outcome" of this case because it confers no legal mechanism to resolve the only issue in dispute. Appellees' assertion of an arbitration-based defense based on the purported ECIAA's arbitration provision is thus "[un]persuasive," "frivolous," "absurd," and legally "impossible." *See, e.g. Hawkins*, 423 F. Supp. 2d at 1047; *Cerner*, 939 F.3d at 1016.

Appellees may argue in response that the Convention supplies jurisdiction because disputes about contract formation go to the merits, not the court's subject-matter jurisdiction. Not true. That principle only applies when a party invokes the Convention to *confirm* or *enforce* an arbitration award under 9 U.S.C. § 207. In that posture, the Ninth Circuit has held that "the existence of a written agreement to arbitrate is a merits question that does not affect subject-matter jurisdiction." *Al-Qarqani v. Chevron Corp.*, 8 F.4th 1018, 1024 (9th Cir. 2021). That is because is those instances the dispute has already been arbitrated and the claim before the court

24

is to confirm an award, which necessarily implicates and "relates to" the enforceability of the arbitration agreement. *Id.* In contrast, a motion to compel arbitration is a pre-award proceeding that requires the court to determine in the first instance whether an arbitration agreement even exists.

Importantly, even in the narrow § 207 context, not all circuits agree. For example, the Eleventh Circuit has found that a party invoking § 207 must still prove a valid written arbitration agreement as a *jurisdictional prerequisite. See Czarina, LLC v. W.F. Poe Syndicate*, 358 F.3d 1286, 1292 (11th Cir. 2004) ("[T]he party seeking confirmation of an award falling under the Convention must" establish the existence of a written agreement to arbitrate "to establish the district court's subject matter jurisdiction"); *Cf. Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 366–67 (4th Cir. 2012) (stating Convention's written-and-signed agreement requirement is a "jurisdictional prerequisite[]"). Even courts adopting a similar approach to *Al-Qarqani* limit the jurisdictional rule narrowly to § 207 enforcement proceedings. *See Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 659-60 & n.2 (2d Cir. 2005) (involving a petition to "confirm and enforce [a] foreign arbitration award").

This case is miles away from that posture. There has not been an internationally related arbitration. There is no pending arbitration award under the Convention. And Mr. Yu is not invoking § 207 or asking the court to enforce anything. He brought a declaratory action under state law to establish that no

arbitration agreement was ever formed. The formation dispute here is logically antecedent to any arbitrable issue and is not even properly referable to arbitration as a defense. Accordingly, the ECIAA does not provide jurisdiction. *See R3 Aero.*, 927 F. Supp. at 123; *Hawkins*, 423 F. Supp. 2d at 1047; *SanDisk*, 84 F. Supp. 3d at 1035.

***Third***, the issue is even more clear with respect to the Ancillary Agreements. Mr. Yu's declaratory judgment complaint said nothing about the Ancillary Agreements, made no claims under them, and requested no relief relating to them. 3-ER-481–86. At the December 2023 hearing, Mr. Yu's former counsel confirmed the narrow scope of the case: "there are grounds to challenge the removal based on the three [ancillary] contracts" because "there's no conceivable connection between those contracts and the issue here, which is simply: Did [Mr. Yu] sign the ECIAA?" 2-ER-019. Judge Illston appeared to agree, noting she was "tempted" to hold that "I don't have current jurisdiction over these other issues [regarding the ancillary agreements] because all you brought to me was the ECIAA question." 2-ER-028. That remains true today.

In fact, at the time of removal, Appellees had never argued that the Ancillary Agreements supported arbitration, let alone that they provided any basis for removal under the Convention. *See* 3-ER-417–18. In both prior removals involving the same parties and nearly identical facts, Appellees asserted only one agreement as grounds

26

for compelling arbitration: the ECIAA, which for the reasons discussed above does not confer jurisdiction.

The Ancillary Agreements also cannot support removal because they contain narrow arbitration clauses covering disputes "arising out of or relating to" each specific agreement. The Patent Agreement calls for arbitration only for claims "arising out of or relating to [the Patent Agreement]; the Stock Agreement called for arbitration for disputes "arising out of or relating to the [Notice of Stock Option Award] the [Company's 2012 Stock Incentive Plan], or this [Stock Option Award Agreement];" and the unsigned Undertaking Agreement calls for arbitration only for disputes "arising out of or relating to [the Undertaking Agreement]." 3-ER-555, 568, 575. None of those arbitration clauses even arguably relate to a declaratory judgment claim challenging the existence of a different contract—the ECIAA. Because the Ancillary Agreements have no bearing on whether Mr. Yu signed the ECIAA, they too do not "relate to" this action and cannot support removal or confer federal jurisdiction.

In short, neither the ECIAA nor the Ancillary Agreements relate to this dispute. For that reason alone, the district court lacked subject matter jurisdiction over Mr. Yu's claim.

27

### 2. Neither the ECIAA nor the Ancillary Agreements fall under the Convention

To fall under the Convention, an arbitration agreement "(1) must arise out of a legal relationship (2) which is commercial in nature and (3) which is not entirely domestic in scope." *Ministry of Def. of Islamic Rep. of Iran v. Gould Inc.*, 887 F.2d 1357, 1362 (9th Cir. 1989). All three elements must be satisfied for jurisdiction to exist. *See* 9 U.S.C. § 202; *Gould*, 887 F.2d at 1362 (referring to the elements as "requirements … for jurisdiction"). None of ByteDance's agreements satisfy these threshold criteria.

#### a. *The ECIAA*

Appellees cannot carry their burden of showing the ECIAA falls under the Convention because it does not satisfy the second and third elements.

#### i. *The ECIAA is not a "commercial" agreement*

The FAA extends the Convention only to arbitration agreements "arising out of … legal relationship[s] … which [are] considered as *commercial*." 9 U.S.C. § 202 (emphasis added). Section 202 provides that legal relationships considered as "commercial" include "a transaction, contract, or agreement described in section 2 of this title." *Id.* The Supreme Court has interpreted the "involving commerce" language in Section 2 as being coextensive with "Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). And while Congress's Commerce Clause power is expansive, it is not unbounded. *See, e.g., United States*

28

*v. Morrison*, 529 U.S. 598, 608 (2000) (holding interstate commerce power does not extend to "indirect and remote" acts such that it "would effectually obliterate the distinction between what is national and what is local") (citation omitted).

For an agreement like the ECIAA to be considered "commercial," the agreement itself "must include an interstate commerce connection to conform with Commerce Clause limitations." *Padilla Ayala v. Teledyne Def. Elecs*., 533 F. Supp. 3d 920, 928 (C.D. Cal. 2021); *see also Southland Corp. v. Keating*, 465 U.S. 1, 10-11 (1984) ("[A]rbitration provisions governed by the [FAA]… must be part of a written ... *contract 'evidencing a transaction involving commerce*[.]'") (emphasis added). Agreements that courts in this Circuit found "affect commerce" generally evince a *clear connection* to interstate commercial activity. *See, e.g.*, *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1150 (9th Cir. 2008) (employment contract to work aboard an international cruise ship, providing for "monthly guaranteed pay" and other compensation terms directly tied to global operations); *Mullen Techs., Inc. v. Qiantu Motor (Suzhou) LTD*., 2020 WL 3573371 (S.D. California July 1, 2020) (manufacturing and distribution of Chinese K50 automobiles in the United States); *Glob. Bldg. Prods. Ltd. v. Chemco, Inc*., 2012 WL 5183629, at *1 (W.D. Wash. Oct. 18, 2012) (agreement for purchase of business selling fire-retardant chemicals in interstate markets); *LaPine v. Kyocera Corp*., 2008 WL 2168914, at *3 (N.D. Cal. May 23, 2008) (corporate reorganization and buyout of interstate shareholders).

29

Here, the ECIAA bears no meaningful connection to interstate commerce, facially or otherwise. For one, "For California Employees" is emblazoned across the top. 3-ER-528. Moreover, the document—providing certain terms regarding a California resident's work at the California headquarters of a California-based corporation—specifies that it is governed by California law, enforced under California statutes, and requires any arbitration to proceed exclusively in California. 3-ER-529–40. This is a document with an *intra*state footprint and a local focus.

Further, the ECIAA is devoid of any terms that expressly contemplate interstate conduct. None of its ten sections mention out-of-state employment, multistate duties, or performance across borders, nor does it contain any interstate exchange of goods, services, or money. 3-ER-529–40. Instead, it is a set of internal corporate covenants, focused entirely on employer control: the employee must "irrevocably assign" work product, consent to use of their name and likeness, maintain records of work, and arbitrate in California under California law. *Id.*

Crucially, the ECIAA is *not* an employment contract. It does not contain a salary, bonus, benefits, or job description, let alone employment terms requiring interstate performance. *Id.* Those core employment terms appear in a separate document: Mr. Yu's Offer Letter, which does not contain an arbitration provision and is itself silent on any obligation to engage in interstate commerce. 3-ER-523.

30

The ECIAA is something entirely different. At its core, the ECIAA settles questions of internal title—who owns what Mr. Yu creates—and imposes standard workplace obligations like confidentiality, non-disparagement, non-solicitation, and at-will employment. It does not compel Mr. Yu to offer services in the interstate marketplace, nor does it obligate him to use any channel or instrumentality of interstate commerce, such as mail, telephone, or electronic systems. 23-ER-529–40. Comparable agreements, equally focused on internal matters and detached from commercial exchange, have been found to fall outside the Convention. *See, e.g.*, *Padilla*, 533 F. Supp. 3d at 926 (employment agreement not "commercial" where "Plaintiff worked for Defendant in Los Angeles County throughout her tenure .… with no indication that this work affected interstate commerce"); *Pineda v. Sun Valley Packing, L.P.*, 2021 WL 5755586, at *2-5 (E.D. Cal. Dec. 3, 2021) (agreement concerning work performed exclusively in California was not "commercial"); *Carbajal v. CWPSC, Inc.*, 245 Cal. App. 4th 227, 240 (2016) ("[T]he Agreement does not have a substantial relationship to interstate commerce because its subject matter … does not involve a channel or instrumentality of interstate commerce[.]").

In short, the ECIAA is not a commercial agreement within the meaning of the Convention. It lacks any nexus to interstate commerce, omits financial or transactional terms, and governs internal matters that fall squarely within an

31

employees' intrastate operations. *Pineda*, 2021 WL 5755586, at \*2-5; *Padilla*, 533 F. Supp. 3d at 926; *Carbajal*, 245 Cal. App. 4th at 240.

### ii. *The ECIAA is domestic in scope*

Even assuming the ECIAA arises out of a commercial legal relationship, the Convention still independently requires an international element to confer jurisdiction. *Gould*, 887 F.2d at 1362. Congress made that clear in 9 U.S.C. § 202, which excludes agreements "entirely between citizens of the United States" unless they "involve[] property located abroad, envisio[n] performance or enforcement abroad, or ha[ve] some other reasonable relation with one or more foreign states." No such foreign nexus exists here for two independent reasons.

***First***, both parties to the ECIAA should be treated as "citizens of the United States" for purposes of the Convention. ByteDance is indisputably a U.S. citizen, as it is incorporated in Delaware and maintains its principal place of business in California. 2-ER-068. Mr. Yu, though a citizen of China in passport, has been a LPR of the U.S. since 2015 and has continuously domiciled in California that entire time, including at the time he allegedly executed the ECIAA. 2-ER-020, 196; 3-ER-400. Moreover, as of this year Mr. Yu is a naturalized U.S. citizen.

While the Convention does not define "citizen," courts have looked to the federal diversity statute, 28 U.S.C. § 1332, as the best available guide. *See, e.g., N. Motors, Inc. v. Knudsen*, 2011 WL 2552573, at \*3 (E.D. Mo. June 27, 2011). While

32

very few cases have addressed the issue directly, the emerging understanding is that LPRs domiciled in the U.S. qualify as "citizens" for purposes of the Convention. *See id.*; *cf. Indus. Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH*, 141 F.3d 1434, 1441 (11th Cir. 1998) (noting that Convention jurisdiction turns on whether a party is "*domiciled* or has its principal place of business outside of the United States.") (emphasis added).

Until its amendment in 2011, § 1332(a) explicitly provided that "an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled." 28 U.S.C. § 1332(a) (2006). This deeming provision—enacted in 1988 shortly after the Convention was enacted— codified the practical reality that LPRs with fixed U.S. domiciles are not meaningfully foreign for jurisdictional purposes. *Id.*

Section 1332(a)'s amendment does not change the rule. Congress repealed the deeming clause only to curb inconsistent judicial decisions—*not* to cast LPRs as foreign for all purposes. *See* H.R. REP. NO. 112-10, at 6–8 (2011) (explaining the deeming clause's repeal was targeted to eliminate inconsistencies and confusion in applying the diversity statute, not to disturb how courts interpret international status in the treaty context).

Indeed, § 1332(a)(2) today still treats LPRs as citizens for purposes of diversity jurisdiction because it expressly denies alienage jurisdiction in actions

33

between a U.S. citizen and a LPR "domiciled in the same State." That exclusion effectively preserves the core premise of the former deeming clause: that an LPR with a fixed U.S. domicile should not be treated as foreign for jurisdictional purposes. This is also reflected in the fact that courts interpreting the Convention have continued to refer to LPR status as relevant to citizenship even after the deeming clause was repealed. *See Zeng v. Ellenoff Grossman & Schole LLP*, 2024 WL 4451605, at *5 (S.D.N.Y. Apr. 10, 2024) ("Plaintiff is not a citizen of the United States for purposes of the Convention because she is neither a *lawful permanent resident* nor a dual citizen of the United States.") (emphasis added).

The consistent treatment of LPRs across federal law further underscores that LPRs are not "foreign" in any meaningful legal sense that would trigger the Convention's concern with international neutrality. Numerous statutes equate LPRs with citizens when it comes to fundamental rights and obligations. For example, like naturalized citizens and unlike undocumented aliens or those on temporary visas, LPRs must register for the draft under the Selective Service Act, 50 U.S.C. § 3802; pay worldwide income taxes under the Internal Revenue Code, 26 U.S.C. §§ 1, 7701(b); are eligible for federal financial aid under 20 U.S.C. § 1091; and may lawfully possess firearms under 18 U.S.C. § 922(g)(5).

In any event, even if the Court were to find that Mr. Yu does not qualify as a "citizen" under the Convention, that does not end the inquiry. Section 202 does not

34

say that foreign citizenship alone is sufficient; it instead carves out agreements "entirely between citizens of the United States," unless the relationship itself crosses borders. 9 U.S.C. § 202. Thus, what matters is the substance of the commercial relationship, as the Convention targets international disputes; not domestic ones with incidental foreign ties.

District courts in this Circuit have recognized as much. In *Padilla Ayala v. Teledyne Def. Elecs.*, the district court rejected Convention jurisdiction even where the plaintiff was a Honduran national, because the relationship was "sufficiently domestic." 533 F. Supp. 3d at 928. Same result in *Pineda v. Sun Valley Packing*, where the plaintiff was a Mexican citizen. 2021 WL 5755586, at *2. The common thread is that foreign citizenship does not transform a wholly domestic employment agreement into an international dispute. That is especially true here. Mr. Yu has lived in California as a LPR since 2015, including when the ECIAA was allegedly signed, and is now a naturalized U.S. citizen.

**Second**, the ECIAA is otherwise domestic in scope. The ECIAA purports to be an agreement between a U.S. domiciliary and a U.S. corporation. On its face it applies to Mr. Yu's "right to disclose or use … certain information and technology learned … during [his] employment" in California. 3-ER-528. The agreement is labeled "For California Employees" and repeatedly references California and U.S. law—including California Labor Code § 2870, California Civil Code § 987, and the

35

U.S. Defend Trade Secrets Act. 3-ER-528–40. It even states it "shall be governed and interpreted in accordance with the laws of California." 3-ER-538. These provisions anchor the agreement firmly in the United States, as nothing in the agreement "involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." 9 U.S.C § 202.

ByteDance's disputed claim that Mr. Yu signed the ECIAA in Beijing does not convert a domestic agreement into an international one. *See Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir. 1983) ("[A]wards 'not considered as domestic' denotes awards which are subject to the Convention not because made abroad, but because made within the legal framework of another country."). The ECIAA was not drafted under Chinese law or intended to govern foreign employment. It was an ancillary document for a California job, governed by California law, and calling for arbitration in California. *See Smoller v. Deutsche Bank AG*, 2006 WL 2129792, at *3 (E.D. Mo. July 31, 2006) ("In entering into this [New York] choice of laws provision and forum selection clause, the parties recognize that the agreements necessarily envisage performance domestically.").

Nor does ByteDance's global footprint change the analysis. The fact that some company materials may have originated abroad, or that Mr. Yu occasionally traveled to China, adds no legal significance. *See Matabang v. Carnival Corp.*, 630 F. Supp.

36

2d 1361, 1366-67 (S.D. Fla. 2009) (no "reasonable relation" to a foreign state despite employee working on "Bahamian-flagged vessel" "that spends 80–85% of the time 'in the Bahamas, in Bahamian waters and sailing on the high seas'" because of the "vessel's home port in Florida"). Otherwise, nearly every domestic employee at a multinational firm could be swept under the Convention's scope.

Equally immaterial are former counsel's offhand remarks at the 2023 hearing speculating about the ECIAA's international character. Counsel admitted at the outset that "the ECIAA is not … an obvious candidate for falling under the Convention." 2-ER-019. His remarks were tentative, not concessions.

Moreover, even if executed, the ECIAA is not Mr. Yu's underlying employment agreement. It is a standalone confidentiality agreement ancillary to his work. *Compare* 3-ER-528 *with* 3-ER-523. So even if Mr. Yu performed some job duties abroad, that does not alter the fundamentally domestic character of the ECIAA itself. What matters is that the ECIAA governs California-based employment, is labeled "For California Employees," and is expressly governed by California law. The Convention does not apply to agreements where foreign elements are incidental rather than integral. *Bergesen*, 710 F.2d at 932 (Convention applies to agreements "made within the legal framework of another country"); *see also* 9 U.S.C. § 202.

Numerous courts have rightly held under circumstances like these that an arbitration agreement or award was insufficient to confer federal jurisdiction. *See*

37

*Padilla*, 533 F. Supp. 3d at 928; *Pineda*, 2021 WL 5755586, at *4; *Matabang*, 630 F. Supp. 2d at 1366-67; *Jones v. Sea Tow Servs.*, 30 F.3d 360, 365 (2d Cir. 1994).[1]

Because both parties are U.S. citizens under the Convention and the ECIAA has no international dimension, the Convention does not apply and the district court lacked subject matter jurisdiction.

### b. The Ancillary Agreements

Even assuming the Ancillary Agreements somehow "relate to" the dispute (they do not), none satisfy the Convention's requirements. ***First***, the agreements do not involve interstate or international commerce. The Stock Agreement concerns compensation and equity. The Undertaking Agreement modified a term of California-based employment. Under the FAA, employment contracts require a showing that the employee's duties affected interstate commerce, which is lacking here. *See Padilla*, 533 F. Supp. 3d at 926; *Pineda*, 2021 WL 5755586, at *4. The Patent Agreement fares no better: it memorialized a single transaction between two Delaware-incorporated U.S. entities concerning a U.S. patent application, paid in U.S. dollars to a U.S. bank account.

---

[1] *See also Smoller*, 2006 WL 2129792 at *3; *Wilson v. Lignotock U.S.A., In*c., 709 F. Supp. 797, 799 (E.D. Michigan, 1989); *Armstrong v. NCL (Bahamas) Ltd.*, 998 F. Supp. 2d 1335, 1338 (S.D. Fla. 2013); *John Zhang v. Dentons U.S. LLP*, 2021 WL 2392169, at *3 (C.D. Cal. June 11, 2021); *Access Info. Mgmt. of Hawaii, LLC v. Shred-It Am., Inc.*, 2010 WL 4642045, at *7 (D. Haw. Nov. 2, 2010).

*Second*, the Ancillary Agreements lack an international nexus. They relate to Mr. Yu's employment in California, and a foreign arbitration or choice of law clause alone is not enough where the agreement's substance is wholly domestic. *See Jones v. Sea Tow Servs. Freeport NY Inc.*, 30 F.3d 360, 366 (2d Cir. 1994) ("[T]he arbitration provisions of the LOF [are] insufficient of themselves to confer jurisdiction under the Convention").

**B.  The District Court's Order Is Likely Interlocutory Under 9 U.S.C. § 16(b)**

On January 17, 2025, this Court *sua sponte* directed the parties to address "the basis for this court's jurisdiction over this appeal." Dkt. 3 (citing *InSync*, 801 F.3d at 1040; *Dees*, 394 F.3d at 1294). Mr. Yu expresses no strong view on whether this Court has appellate jurisdiction, as Mr. Yu filed this appeal "out of an abundance of caution to preserve appellate rights." *See* 4-ER-579 n.1. However, the order likely qualifies as interlocutory, not a final judgment.

This Court reviews questions of appellate jurisdiction *de novo*. *See Sauk-Suiattle Indian Tribe* 56 F.4th at 1184. Federal appellate jurisdiction extends to "final decisions of the district courts of the United States." 28 U.S.C. § 1291. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945). Likewise, 9 U.S.C. § 16(b) bars interlocutory appeals from orders "(1) granting a stay of any action under section 3 of this title" or "(3) compelling arbitration under

39

section 206 of this title." 9 U.S.C. § 16(b). However, § 16(a)(3) carves out a narrow exception: an appeal may be taken from "a final decision with respect to an arbitration that is subject to this title." *Id.* § 16(a)(3).

In *Green Tree Financial Corp.-Alabama v. Randolph*, the Supreme Court interpreted the "final decision" language to include orders that "plainly dispose[] of the entire case on the merits and [leave] no part of it pending before the court." 531 U.S. 79, 86 (2000). Thus, an order compelling arbitration and dismissing the underlying claims qualifies as a final under § 16(a)(3), whereas an order that compels arbitration and enters a stay is interlocutory under § 16(b)(1). *Id.* at 87 n.2 ("Had the District Court entered a stay instead of a dismissal in this case, that order would not be appealable.") (citing § 16(b)(1)). This Court has repeatedly followed the *Green Tree* rule. *See Dees*, 394 F.3d at 1292, 1294 (holding an order was not appealable where "the trial court stayed the action and compelled arbitration") (citing *Green Tree*, 531 U.S. at 86).[2]

The Ninth Circuit's limited expansion of appellate jurisdiction under § 16(a)(3) in *InSync* does not render the district court's order a final judgment. The

---

[2] S*ee also Bushley v. Credit Suisse*, 360 F.3d 1194, 1153 n.1 (9th Cir. 2004); *Reg'l Local Union No. 846 v. Gulf Coast Rebar, Inc.*, 736 Fed. Appx. 666, 668 (9th Cir. 2018); *Diaz v. Macys Stores, Inc.*, 101 F.4th 697, 701 (9th Cir. 2024); *MediVas, LLC v. Marubeni Corp.*, 741 F.3d 4, 6–9 (9th Cir. 2014) ("[A]n order compelling arbitration may be appealed if the district court dismisses all the underlying claims, but may not be appealed if the court stays the action pending arbitration.").

*Insync* Court held that where a petition to compel arbitration under 9 U.S.C. § 4 is the sole issue before the district court, an order granting that petition and staying proceedings is a final decision within the meaning of § 16(a)(3), and thus immediately appealable, because there is nothing left to adjudicate and the stay has "no legal or practical effect." *See* 801 F.3d at 1039–41. As the Ninth Circuit explained, a court "presented with a petition to compel arbitration and no other claims cannot prevent appellate review … by issuing a stay." *Id*. at 1041.[3]

Here, the district court was not presented with a § 4 petition and no other claims. Mr. Yu filed substantive claims for declaratory relief under California State law. 3-ER-485. Appellees then removed the case and moved to compel arbitration, invoking § 3 of the FAA and requesting a stay. 3-ER-457 ("Defendants further request this Court stay this action pending the compelled claims arbitral.") (citing 9 U.S.C. § 3). As required by 9 U.S.C. § 203, the district court granted that stay. Thus, *InSync*'s finality rule likely does not apply here because Mr. Yu submitted live

---

3 Other circuits that have recognized a carveout to Green Tree have taken a similarly narrow view, finding finality only where the district court is presented with a bare § 4 petition and no other underlying claims. See, e.g., *Allied Indus. & Serv. Workers Int'l Union v. Wise Alloys, LLC*, 807 F.3d 1258, 1267 (11th Cir. 2015); *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 391–93 (5th Cir. 2006); *Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 616–17 (7th Cir. 2024) ("Because the consumers proceeded in the district court under § 4 and merely sought an order compelling arbitration, the limitation on appellate review found in § 16(b)(1) is inapposite.").

claims beyond a § 4 petition, and the stay entered under § 3 was not a mistaken procedural formality but a result ByteDance expressly requested.

## VII.  CONCLUSION

The record evidence demonstrates that the ECIAA does not fall under the Convention. Accordingly, the district court lacked subject matter jurisdiction from the outset. This Court should vacate the order imposing terminating sanctions and remand the case to state court, where it belongs.

Dated:   August 25, 2025

Respectfully submitted,

SUSMAN GODFREY L.L.P.

*/s/ Tanner H. Laiche*
Bryan Caforio
Jesse-Justin Cuevas
Tanner H. Laiche

*Attorneys for Appellant Yintao Yu*

42

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** No. 25-297

I am the attorney or self-represented party.

**This brief contains** 10,003 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Tanner H. Laiche  **Date** August 25, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*