No. 25-297

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

YINTAO YU,

*Plaintiff-Counter-Defendant-Appellant,*

v.

SHUYI (SELENE) GAO,

*Defendant-Appellee,*

BYTEDANCE INC.,

*Defendant-Counter-Claimant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California,
No. 3:23-cv-04910-SI (Judge Susan Illston)

## BRIEF FOR APPELLEES

Gregory G. Iskander
LITTLER MENDELSON, PC
1255 Treat Boulevard, Suite 600
Walnut Creek, CA  94597
(925) 927-4543
giskander@littler.com

Demery E. Ryan
Alexandra Bernstein
LITTLER MENDELSON, PC
2049 Century Park East, 5th floor
Los Angeles, CA  90067
(310) 772-7248

*Counsel for Appellee*
*Shuyi (Selene) Gao*

Benjamin W. Snyder
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC  20036
(202) 551-1700
bensnyder@paulhastings.com

Elena R. Baca
Felicia A. Davis
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
(213) 683-6000

Ben Gifford
PAUL HASTINGS LLP
200 Park Avenue
New York, NY  10166
(212) 318-6000

*Counsel for Appellee ByteDance Inc.*

## DISCLOSURE STATEMENT

ByteDance Inc. is a wholly owned subsidiary of ByteDance Ltd. ByteDance Ltd. is a privately held corporation, and no public entity owns 10% or more of the stock of ByteDance Inc. or ByteDance Ltd.

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ..................................................................... i

TABLE OF AUTHORITIES ....................................................................... iii

INTRODUCTION ....................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................ 3

STATEMENT OF THE ISSUES ................................................................ 3

STATEMENT OF THE CASE ................................................................... 3

I. Factual Background ...................................................................... 3

II. Procedural Background ................................................................ 5

SUMMARY OF THE ARGUMENT ......................................................... 11

STANDARD OF REVIEW ....................................................................... 13

ARGUMENT ............................................................................................. 13

I. The District Court Had Subject Matter Jurisdiction .................. 14

    A. The Subject Matter Of Yu's State-Court Action Relates To The ECIAA ................................................................... 15

    B. The ECIAA Falls Under The Convention ............................ 21

        1. The ECIAA Arises Out Of A Commercial Legal Relationship .................................................................. 22

        2. The Legal Relationship Was Not Entirely Between U.S. Citizens ............................................................. 29

        3. The Legal Relationship Involves Property Located Abroad And Has A Reasonable Relation With One Or More Foreign States ............................................. 34

II. This Court Has Jurisdiction Over Yu's Appeal ........................... 40

CONCLUSION .......................................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Acosta v. Master Maint. & Constr. Inc.*,
452 F.3d 373 (5th Cir. 2006) ....................................................16, 19, 20

*Allied-Bruce Terminix Cos. v. Dobson*,
513 U.S. 265 (1995)..........................................................................25, 26

*American Heritage Life Ins. Co. v. Orr.*
294 F.3d 702 (5th Cir. 2002) ..................................................................43

*American Int'l Specialty Lines Ins. Co. v. Elec. Data Sys. Corp.*,
347 F.3d 665 (7th Cir. 2003) ..................................................................43

*Beiser v. Weyler*,
284 F.3d 665 (5th Cir. 2002) ............................................................18, 19

*Bergesen v. Joseph Muller Corp.*,
710 F.2d 928 (2d Cir. 1983) ....................................................................37

*Budinich v. Becton Dickinson & Co.*,
486 U.S. 196 (1988)..................................................................................45

*Carbajal v. CWPSC, Inc.*,
245 Cal. App. 4th 227 (2016) ..................................................................28

*Cerner Middle E. Ltd. v. Belbadi Enters. LLC*,
939 F.3d 1009 (9th Cir. 2019) ................................................................16

*Cir. City Stores, Inc. v. Adams*,
532 U.S. 105 (2001)..................................................................................23

*Citizens Bank v. Alafabco, Inc.*,
539 U.S. 52 (2003)....................................................................................22

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,
482 F.3d 1091 (9th Cir. 2007) ..................................................................9

*Corporacion AIC, SA v. Hidroelectrica Santa Rita S.A.*,
66 F.4th 876 (11th Cir. 2023) ................................................................33

*Dees v. Billy*,
394 F.3d 1290 (9th Cir. 2005) ................................................................43

*Dodd v. United States*,
545 U.S. 353 (2005)..................................................................................29

iii

*Freudensprung v. Offshore Tech. Servs., Inc.*,
379 F.3d 327 (5th Cir. 2004) ................................................................33

*GE Energy Power Conversion France SAS, Corp. v.
Outokumpu Stainless USA, LLC*,
590 U.S. 432 (2020) .............................................................................35

*Gonzales v. Raich*,
545 U.S. 1 (2005)..................................................................22, 24, 25

*Green Tree Fin. Corp.-Alabama v. Randolph*,
531 U.S. 79 (2000)............................................ 13, 40, 41, 42, 43, 44

*Hodgson v. Bowerbank*,
9 U.S. (5 Cranch) 303 (1810) ..............................................................31

*Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*,
141 F.3d 1434 (11th Cir. 1998) ...........................................................33

*Infuturia Glob. Ltd. v. Sequus Pharms., Inc.*,
631 F.3d 1133 (9th Cir. 2011) ...............................................16, 18, 20

*Int'l All. of Theatrical Stage Emp. & Moving Picture
Technicians, Artists, & Allied Crafts of the United States v.
InSync Show Prods., Inc.*,
801 F.3d 1033 (9th Cir. 2015) .................................13, 41, 42, 43, 45

*Jones Day v. Orrick, Herrington & Sutcliffe, LLP*,
42 F.4th 1131 (9th Cir. 2022) ........................................................14, 21

*Jones v. Sea Tow Servs. Freeport NY Inc.*,
30 F.3d 360 (2d Cir. 1994) .............................................................35, 37

*Lomax v. Ortiz-Marquez*,
140 S. Ct. 1721 (2020)..........................................................................17

*Matabang v. Carnival Corp.*,
630 F. Supp. 2d 1361 (S.D. Fla. 2009) ...........................................38, 39

*North Motors, Inc. v. Knudsen*,
No. 10-cv-1317, 2011 WL 2552573 (E.D. Mo. June 27, 2011).........32

*Outokumpu Stainless USA, LLC v. Converteam SAS*,
902 F.3d 1316 (11th Cir. 2018) ............................................................35

*Padilla Ayala v. Teledyne Def. Elecs.*,
533 F. Supp. 3d 920 (C.D. Cal. 2021) .......................................27, 28, 33

iv

*Pineda v. Sun Valley Packing, L.P.*,
No. 1:21-cv-01265, 2021 WL 5755586 (E.D. Cal. Dec. 3, 2021) ...............28, 33

*Reno v. Condon*,
528 U.S. 141 (2000)...............................................................................27

*Ruhrgas AG v. Marathon Oil Co.*,
526 U.S. 574 (1999)...............................................................................14

*Schnabel v. Lui*,
302 F.3d 1023 (9th Cir. 2002) ...............................................................13

*Smoller v. Deutsche Bank AG*,
No. 06-cv-436, 2006 WL 2129792 (E.D. Mo. July 31, 2006) ..........................38

*Soaring Wind Energy, L.L.C. v. Catic USA Inc.*,
946 F.3d 742 (5th Cir. 2020) ..........................................................35, 36, 37

*Solomon v. St. Joseph Hosp.*,
62 F.4th 54 (2d Cir. 2023) .....................................................................14

*Sturgeon v. Frost*,
587 U.S. 28 (2019)................................................................................32

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025)................................................................................24

*Tillman v. Tillman*,
825 F.3d 1069 (9th Cir. 2016) ................................................................42

*United States v. Clayton*,
108 F.3d 1114 (9th Cir. 1997) ...........................................................23, 27

*United States v. Tello*,
600 F.3d 1161 (9th Cir. 2010) ................................................................23

*United States v. Wilson*,
123 F.4th 1021 (9th Cir. 2024) ...............................................................13

*Wulfe v. Valero Refin. Co.-California*,
641 F. App'x 758 (9th Cir. 2016).............................................................23

*Zeng v. Ellenoff Grossman & Schole LLP*,
No. 23-cv-10348, 2024 WL 4451605 (S.D.N.Y. Apr. 10, 2024).......................32

v

**STATUTES**

9 U.S.C. § 9 ..............................................................................................44

9 U.S.C. § 10 ............................................................................................44

9 U.S.C. § 11 ............................................................................................44

9 U.S.C. § 16 ...........................................................................3, 12, 40, 41

9 U.S.C. § 201 ..........................................................................................14

9 U.S.C. § 202 ..........................................12, 15, 21, 22, 29, 30, 32, 33, 34, 35, 39

9 U.S.C. § 203 ............................................................................................3

9 U.S.C. § 205 ..................................3, 5, 6, 7, 11, 12, 15, 16, 17, 18, 19, 20, 21, 38

18 U.S.C. § 1836 .....................................................................................27

28 U.S.C. § 1291 .......................................................................................3

28 U.S.C. § 1331 .......................................................................................3

28 U.S.C. § 1332 (2006) .........................................................................30

28 U.S.C. § 1367 .....................................................................................40

28 U.S.C. § 1446 .......................................................................................5

**LEGISLATIVE AUTHORITY**

H.R. Rep. No. 112-10 (2011).............................................................30, 31

**OTHER AUTHORITY**

*American Heritage Dictionary of the English Language* (4th ed. 2000) ................16

## INTRODUCTION

Plaintiff-Appellant Yintao Yu is a classically abusive litigant. After his employment was terminated in 2018 as part of a reduction in force that affected all members of his team, Yu began a meritless and often convoluted litigation campaign that continues to this day. Yu filed an initial state-court action against Defendant-Appellee ByteDance Inc. ("BDI") in 2022, but, after removal to federal court, that case was dismissed for failure to prosecute. Yu promptly filed a second state-court action raising nearly identical claims, this time against both BDI and one of its employees, Defendant-Appellee Selene Gao. That case was again removed to federal court, which dismissed several of Yu's claims and remanded the rest to state court (where they remain pending).

A common problem for both of Yu's initial suits was that he was required to arbitrate his claims pursuant to an employment agreement, the Employee Confidentiality and Inventions Assignment Agreement ("ECIAA"), that he signed when BDI hired him in 2017. Yu accordingly filed a third state-court action—the one that gives rise to this appeal—in which he alleged that he had never signed the ECIAA at all. He sought a declaratory judgment to that effect, as well as an injunction prohibiting BDI from enforcing the ECIAA against him.

BDI removed the case to federal court, moved to compel arbitration, and filed counterclaims seeking declaratory and injunctive relief regarding the ECIAA and

1

three other agreements. Yu never contested removal, but he opposed arbitration, and he steadfastly maintained that he had never signed the ECIAA. To that end, Yu engaged in a course of serial misconduct that included perjured statements during his deposition and the fabrication of what purported to be an anonymous declaration from a BDI employee supporting Yu's story.

Based on that misconduct (which Yu now attempts to downplay as "some serious missteps" taken "in reliance on questionable legal advice," Opening Br. 15), BDI moved for terminating sanctions. After holding an evidentiary hearing at which Yu repeatedly invoked the Fifth Amendment, the district court granted BDI's motion, dismissed Yu's complaint, and entered default judgment on BDI's counterclaims. In so doing, the court declared that Yu had signed the ECIAA (as well as the other agreements) and ordered him to arbitrate all claims that he had brought or might bring in his pending state-court action. The court then stayed the case pending resolution of Yu's state-court claims in arbitration.

Yu now appeals, but he does not contest the district court's findings regarding his abuse of the judicial process or its decision to enter terminating sanctions against him. Rather, he argues for the first time—and contrary to his concessions below—that removal was improper and that the district court lacked subject matter jurisdiction to begin with. Yu also argues, albeit half-heartedly, that this Court lacks jurisdiction over his appeal.

2

Yu's jurisdictional arguments are just a continuation of the abusive litigation that he has pursued for years. And for the reasons below, they provide no basis for allowing him to avoid his obligations under the ECIAA. This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and 9 U.S.C. § 203. This Court has jurisdiction under 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(3).

## STATEMENT OF THE ISSUES

1. Whether removal was proper under 9 U.S.C. § 205, where the removed action sought declaratory and injunctive relief with respect to an arbitration agreement, and where that arbitration agreement arose from a commercial legal relationship that was not entirely between U.S. citizens.

2. Whether this Court has jurisdiction to review an order that ends the litigation on the merits of the parties' claims, compels arbitration of claims filed in a separate state-court action, and enters a stay pending resolution of that arbitration.

## STATEMENT OF THE CASE

### I. Factual Background

BDI is a technology company that supports entertainment platforms accessible to users throughout the United States. *See* 3-ER-400. In the summer of 2017, BDI hired Yu for an engineering role. *See* 3-ER-401. At all relevant times, Yu was a citizen of China and a lawful permanent resident of the United States. *See* 3-ER-400-401.

3

As part of his onboarding, Yu signed four agreements while in China. *See* 3-ER-402-406. The agreement most relevant to this appeal is the Employee Confidentiality and Inventions Assignment Agreement ("ECIAA"), which was entered into by Yu, BDI, and BDI's "affiliates." *See* 3-ER-528-544. The ECIAA includes a number of material employment terms, and it also governs the rights and obligations of Yu, BDI, and its affiliates with respect to confidential information and intellectual property. *See id.* Of particular relevance here, the ECIAA contains an arbitration clause that provides for arbitration of "any dispute, controversy or claim arising out of or relating to or resulting from [Yu's] employment with [BDI]." 3-ER-538.

In 2018, Yu's employment was terminated as part of a reduction in force that affected all of the individuals on the engineering and business development teams of the product on which Yu worked. *See* 3-ER-401. In November 2022, Yu filed a lawsuit against BDI in San Francisco Superior Court, alleging retaliation and federal unpaid-leave claims. *See id.* BDI removed the case to federal court and moved to compel arbitration under the ECIAA. *See* 3-ER-401-402. On April 20, 2023, after Yu failed to respond to BDI's motion to compel arbitration, the district court dismissed the case for failure to prosecute. *See* 3-ER-402.

Less than two weeks later, Yu filed a nearly identical second lawsuit in San Francisco Superior Court, this time naming as defendants both BDI and Selene Gao,

4

who was an employee in BDI's Human Resources department. *See* 3-ER-402.[1] BDI removed to federal court and moved to compel arbitration under the ECIAA. *See id.* Yu moved to remand to state court. *See id.* The district court found that removal was proper, but it remanded the case to state court after dismissing certain portions of the complaint as preempted by federal copyright law. *See id.* The remainder of Yu's claims remain pending in state court. *See id.*

## II. Procedural Background

Four days after Yu's second case was remanded, he filed the instant lawsuit in San Francisco Superior Court. *See* 3-ER-481-487. In his complaint, Yu sought a declaration that he had never signed the ECIAA. *See* 3-ER-485. He also sought an injunction prohibiting BDI from enforcing the ECIAA against him. *See id.*

BDI again removed to federal court and moved to compel arbitration of Yu's pending state-court claims pursuant to the ECIAA and the three other agreements Yu signed. *See* 3-ER-465-474 (notice and petition for removal); 3-ER-437-459 (motion to compel arbitration). BDI asserted that removal was proper under the federal civil removal statute, 28 U.S.C. § 1446, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 205. *See* 3-ER-467. As BDI explained, "[a] defendant may remove under the Convention '[w]here the subject matter of an action or proceeding pending in State court relates

---

[1] For the sake of simplicity, this brief refers to defendants collectively as "BDI."

to an arbitration agreement or award falling under the Convention.'" 3-ER-469 (quoting 9 U.S.C. § 205). And an arbitration agreement falls under the Convention where "the agreement arises out of a commercial legal relationship," and "either: (a) a party to the agreement is not an American citizen; or (b) the relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." 3-ER-469-470 (internal quotation marks omitted). Yu did not move to remand the case to state court.

Ahead of the hearing on BDI's motion to compel arbitration, the district court directed the parties to be prepared to address several questions, including some related to BDI's decision to remove the case under 9 U.S.C. § 205. *See* 3-ER-410-411. At the hearing, Yu's trial counsel essentially conceded that removal was proper. *See* 2-ER-18-21. In explaining why Yu had not challenged removal, Yu's trial counsel admitted that, "when we looked at the ECIAA and looked at the statute and the precedent, . . . we didn't feel very confident." *See* 2-ER-19. He noted that "[t]here are lots of components about the ECIAA that . . . are international in nature"; that it "governs confidential information that would be held abroad," because "we're talking about confidential materials or proprietary materials for ByteDance"; that Yu "travel[ed] to China in the course of his employment and probably would have done more traveling had he continued to be employed"; and that the ECIAA's "disclosure . . . provisions apply worldwide." 2-ER-19-21.

6

"[W]hen we took a step back," Yu's trial counsel concluded, "we couldn't say that . . . this contract was entirely domestic in scope." 2-ER-21.[2]

Following the hearing, BDI answered Yu's complaint and asserted counterclaims seeking declarations that Yu had signed the ECIAA and the other three agreements, along with an injunction ordering enforcement of the arbitration clauses in those agreements with respect to Yu's pending state-court claims. *See* 3-ER-394-407. Yu moved to dismiss BDI's counterclaims and opposed BDI's motion to compel arbitration. *See* 3-ER-327-335 (motion to dismiss); 3-ER-412-428 (opposition to motion to compel). In support of his opposition to BDI's motion to compel, Yu submitted a sworn declaration in which he denied signing the ECIAA. *See* SER-167-169.

On February 20, 2024, the district court issued an order denying both BDI's motion to compel and Yu's motion to dismiss BDI's counterclaims. 3-ER-314-319. Among other things, the court concluded that there was a factual dispute as to whether Yu had signed the ECIAA. 3-ER-318. The court explained that "[i]f a jury concludes that Yu signed the ECIAA," BDI would be entitled to judgment on "Yu's

---

[2] Yu suggests that "the district court . . . questioned the legitimacy of [BDI's] . . . invocation of federal jurisdiction under the Convention" because it "ordered the parties to address . . . whether Mr. Yu could 'challenge the removal of this case under 9 U.S.C. § 205.'" Opening Br. 13 (quoting 3-ER-410). But the court simply identified seven questions for discussion at the hearing. *See* 3-ER-410-411. As indicated, the resulting discussion made quite clear that removal was appropriate.

claims for declaratory and injunctive relief and the parties will be required to arbitrate Yu's employment claims, as Yu does not dispute that the ECIAA's broad arbitration clause applies to his employment claims." *Id.* The parties accordingly proceeded to engage in months of full-blown discovery on the question of whether Yu had signed the ECIAA.

As the district court later found, Yu engaged in repeated and egregious misconduct during the course of that discovery. By doing so, he substantially prolonged the litigation and ultimately caused BDI to incur millions of dollars in discovery-related costs and attorney's fees. *See* SER-14. Two instances of Yu's misconduct are particularly noteworthy here. First, Yu perjured himself during his deposition by denying that he had signed a bankruptcy filing that BDI intended to use as an exemplar of his signature. *See* 1-ER-6. Second, Yu submitted what he represented was a declaration from an anonymous employee in BDI's Human Resources department that supported his claim. *See* 1-ER-4. When BDI tried to learn the identity of the anonymous declarant, however, Yu resisted. *See id.* And when the court ordered Yu to identify the declarant in response to BDI's motion to compel such information, he refused to comply. *See id.* Yu instead submitted a sworn declaration in which he claimed that he was concerned the anonymous declarant's safety would be compromised if the declarant's identity was disclosed. *See* 1-ER-5. After the court again ordered Yu to disclose the declarant's identity,

8

Yu (after further delay) named a former BDI employee. *Id.* That individual, however, denied ever having signed the declaration (or even seen it) and instead submitted a sworn declaration in support of BDI. *See* 1-ER-5-6.

On October 25, 2024, after the evidence of Yu's misconduct had become overwhelming, BDI filed a motion for terminating sanctions. SER-133-162; *see Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007) (explaining that a "terminating sanction" can include "default judgment against a defendant or dismissal of a plaintiff's action"). Specifically, BDI's motion sought an order dismissing Yu's complaint and entering default judgment on BDI's counterclaims, including by compelling Yu to arbitrate, pursuant to the ECIAA, all claims that were pending or could be brought in his state-court action. SER-163-166.

On November 20, 2024, the court held an evidentiary hearing on BDI's motion. At the start of the hearing, Yu's attorney informed the court that Yu intended to assert his Fifth Amendment rights with respect to any questions, including those regarding the anonymous declaration and the bankruptcy petition. *See* SER-50-51, SER-97-98. Yu's counsel also acknowledged that it would be appropriate for the court to draw adverse inferences against Yu as a result of that assertion, and that, taken together with the other evidence that had been submitted, those adverse inferences would be sufficient for the court to grant BDI's motion for

9

terminating sanctions. *See* SER-51-52. Yu proceeded to invoke his Fifth Amendment rights with respect to all questions asked of him. *See* SER-100-114.

On December 12, the court granted BDI's motion for terminating sanctions. 1-ER-2-13. The court found that Yu had "engaged in serious, bad faith conduct that has abused the judicial process," including by "fabricat[ing] the anonymous declaration" and "submitt[ing] a perjurious declaration to this Court . . . in an apparent attempt to prevent defendants from discovering that he had fabricated the anonymous declaration." 1-ER-10-11. The court also found that "Yu committed perjury at his deposition when he denied signing the" bankruptcy filing. 1-ER-11. Based on "the gravity of Yu's misconduct, the Court conclude[d] that terminating sanctions are warranted." *Id.* The court noted that "Yu's credibility is central to his theory in this declaratory relief action that he did not sign any of the arbitration agreements," and that "Yu's obstructive and mendacious conduct has caused delay, required additional motion practice, and vexatiously multiplied these proceedings." *Id.* Accordingly, the court dismissed Yu's complaint and entered default judgment on Defendants' counterclaims, including by declaring that Yu had signed the ECIAA and other agreements and compelling Yu to arbitrate his state-court claims pursuant

10

to the ECIAA.  1-ER-13.  The court also stayed the case pending resolution of the arbitration proceedings.  *Id.*[3]

On January 13, 2025, Yu filed his notice of appeal.  4-ER-579.  On January 17, this Court ordered the parties to brief the basis for its jurisdiction over Yu's appeal.  ECF No. 3.

On March 6, 2025, BDI filed a motion for sanctions against Yu's trial counsel as a result of their participation in, and facilitation of, Yu's misconduct.  SER-4-7.  The district court denied that motion "without prejudice to renewal after the completion of [Yu's] Ninth Circuit appeal," because "the resolution of that appeal could impact the Court's determination of the latest sanctions motion."  SER-3.

## SUMMARY OF THE ARGUMENT

The district court had subject matter jurisdiction over this case, and this Court has jurisdiction over Yu's appeal.

**I.**     Under the Convention Act, which implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention"), a defendant may remove an action from state to federal court if it "relates to an arbitration agreement" that "fall[s] under the Convention."  9 U.S.C. § 205.  In general, an arbitration agreement falls under the Convention if it "aris[es] out of a

---

[3] Yu voluntarily submitted to arbitration of his state-court claims on December 5, 2024.  *See* Laiche Decl. ¶ 6, ECF No. 34.1, at 11.  The parties are currently proceeding in AAA arbitration.  *See id.*

11

legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of [the Federal Arbitration Act]." 9 U.S.C. § 202. If the agreement "aris[es] out of such a relationship which is entirely between citizens of the United States," however, then it falls under the Convention only if "that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." *Id.*

Here, removal was proper, and the district court had jurisdiction. The subject matter of Yu's state-court action "relates to" the ECIAA, 9 U.S.C. § 205, because the action sought a declaratory judgment that Yu never signed the ECIAA and an injunction against enforcement of the ECIAA. And the ECIAA falls under the Convention because it "aris[es] out of a" commercial legal relationship that is not entirely between U.S. citizens and that, in any event, both involves property located abroad and has a reasonable relation with one or more foreign states. 9 U.S.C. § 202.

**II.** Contrary to Yu's half-hearted argument that his own appeal was improper, this Court has jurisdiction to review the district court's order. The Federal Arbitration Act ("FAA") provides that "[a]n appeal may be taken from . . . a final decision with respect to an arbitration that is subject to this title." 9 U.S.C. § 16(a)(3). And the Supreme Court has explained in interpreting Section 16(a)(3) that the term "final decision" means "a decision that ends the litigation on the merits

12

and leaves nothing more for the court to do but execute the judgment." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 86 (2000) (internal quotation marks omitted). Here, the district court's order dismissing Yu's complaint and entering default judgment on BDI's counterclaims was a final decision—and thus is appealable—because it ended the litigation on the merits of all of the parties' claims, and it left nothing more for the court to do but execute the judgment once Yu and BDI finish arbitrating the claims that Yu filed in his separate state-court action. That the district court also entered a stay is immaterial under this Court's precedents. *See Int'l All. of Theatrical Stage Emp. & Moving Picture Technicians, Artists, & Allied Crafts of the United States v. InSync Show Prods., Inc.*, 801 F.3d 1033, 1040 (9th Cir. 2015).

## STANDARD OF REVIEW

"Removal presents a question of subject matter jurisdiction, which is reviewed de novo." *Schnabel v. Lui*, 302 F.3d 1023, 1029 (9th Cir. 2002). Likewise, this Court "review[s] [its] appellate jurisdiction de novo." *United States v. Wilson*, 123 F.4th 1021, 1025 (9th Cir. 2024).

## ARGUMENT

The district court had subject matter jurisdiction under the Convention Act because Yu's state-court action related to the ECIAA, and because the ECIAA is an arbitration agreement falling under the Convention. And this Court has appellate

13

jurisdiction because the district court's order dismissing Yu's complaint and entering default judgment on BDI's counterclaims was a final decision with respect to an arbitration. Because both issues presented are jurisdictional, this Court may consider them in either order. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999); *see also Solomon v. St. Joseph Hosp.*, 62 F.4th 54, 59 (2d Cir. 2023) (beginning with the district court's subject matter jurisdiction where appellate jurisdiction was also at issue). And because subject matter and appellate jurisdiction both exist, this Court should affirm.

## I. The District Court Had Subject Matter Jurisdiction

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards "has been adopted by nearly 200 nations worldwide because of the expanding role arbitration plays in resolving international commercial disputes." *Jones Day v. Orrick, Herrington & Sutcliffe, LLP*, 42 F.4th 1131, 1139 (9th Cir. 2022). "The purpose of the Convention is twofold: (1) to ensure that countries recognize and enforce arbitration agreements, and (2) to ensure that countries recognize and enforce foreign arbitral awards." *Id.* The United States has implemented the Convention through the Convention Act, 9 U.S.C. § 201 *et seq*.

Under the Convention Act, a defendant may remove an action from state to federal court if "the subject matter of [the] action or proceeding pending in [the] State court relates to an arbitration agreement or award falling under the

14

Convention." 9 U.S.C. § 205. In general, an arbitration agreement falls under the Convention if it "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of [the FAA]." 9 U.S.C. § 202. If the arbitration agreement "aris[es] out of such a relationship which is entirely between citizens of the United States," however, then it falls under the Convention only if "that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." *Id.*

Here, the subject matter of Yu's state-court suit relates to the ECIAA because that suit sought both a declaratory judgment that Yu never signed the ECIAA and an injunction barring enforcement of the ECIAA. And the ECIAA falls under the Convention because it arises out of a commercial legal relationship; that legal relationship was not entirely between U.S. citizens; and, even if it were, the legal relationship involves property located abroad and has some other reasonable relation with one or more foreign states. Accordingly, removal was proper, and the district court had subject matter jurisdiction.

### A. The Subject Matter Of Yu's State-Court Action Relates To The ECIAA

As just noted, removal is proper under Section 205 if "the subject matter of an action or proceeding pending in a State court *relates to* an arbitration agreement . . . under the Convention." 9 U.S.C. § 205 (emphasis added). "Relate"

15

means simply "to have connection, relation, or reference." *Acosta v. Master Maint. & Constr. Inc.*, 452 F.3d 373, 378 (5th Cir. 2006) (quoting *American Heritage Dictionary of the English Language* (4th ed. 2000)). In the context of Section 205 in particular, this Court has "described the phrase 'relates to' as 'plainly broad,' and interpreted it accordingly." *Cerner Middle E. Ltd. v. Belbadi Enters. LLC*, 939 F.3d 1009, 1014–15 (9th Cir. 2019) (quoting *Infuturia Glob. Ltd. v. Sequus Pharms., Inc.*, 631 F.3d 1133, 1138 (9th Cir. 2011)); *see Infuturia*, 631 F.3d at 1138 ("The phrase 'relates to' is plainly broad, and has been interpreted to convey sweeping removal jurisdiction . . . .").

"[T]he plain and expansive language of the removal statute embodies Congress's desire to provide the federal courts with broad jurisdiction over Convention Act cases in order to ensure reciprocal treatment of arbitration agreements by cosignatories of the Convention." *Acosta*, 452 F.3d at 376. Yu (at 19) cites cases from other contexts in which courts have construed removal statutes narrowly. But this Court has explained that "[a]lthough we generally construe removal statutes strictly, the plain language of § 205 provides federal courts with remarkably broad removal authority." *Infuturia*, 631 F.3d at 1138 n.5 (citation omitted). Other courts are in accord. *See Acosta*, 452 F.3d at 377 ("So generous is the removal provision that we have emphasized that the general rule of construing removal statutes strictly against removal cannot apply to Convention Act cases

16

because in these instances, Congress created special removal rights to channel cases into federal court." (internal quotation marks omitted)).

Here, it is self-evident that Yu's suit about the validity and enforceability of the ECIAA is an action whose subject matter relates to—i.e., has a "connection, relation, or reference" to—the ECIAA. Indeed, if the action relates to anything, it is the ECIAA. Yu's entire argument to the contrary depends on his position that "to satisfy § 205, a defendant must demonstrate a reasonable possibility that the arbitration agreement will apply to the claims and could support a motion to compel arbitration." Opening Br. 21 (internal quotation marks omitted). That position, however, has no basis in the text of Section 205. Again, that section provides for removal if "the *subject matter of* an action or proceeding pending in a State court *relates to* an arbitration agreement . . . under the Convention." 9 U.S.C. § 205 (emphases added). It does not limit removal to circumstances in which the *claims brought in* an action or proceeding pending in a state court *are subject to arbitration under* an arbitration agreement under the Convention. Adopting Yu's position would require reading key terms out of the provision and inserting others. And "this Court may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020).

Nor does Yu's argument find support in this Court's cases. Yu cites (at 20) this Court's decision in *Infuturia*, which held that "whenever an arbitration

17

agreement falling under the Convention could conceivably affect the outcome of the plaintiff's case, the agreement 'relates to' the plaintiff's suit." 631 F.3d at 1138 (emphasis omitted) (quoting *Beiser v. Weyler*, 284 F.3d 665, 669 (5th Cir. 2002)). And Yu appears to interpret *Infuturia* as limiting Section 205's application to circumstances in which the claims in the removed action would be subject to arbitration under the agreement to which the action's subject matter relates. *See* Opening Br. 24 ("The arbitration clause cannot conceivably 'affect the outcome' of this case because it confers no legal mechanism to resolve the only issue in dispute."). But *Infuturia* expressly foreclosed such an interpretation; there the Court held that an affirmative defense conferred removal jurisdiction on the district court even though it related to an arbitration agreement *to which the defendant was not a party*. *See* 631 F.3d at 1138–39; *see id.* at 1138 (rejecting plaintiff's argument that "only parties privy to an arbitration agreement or award falling under the Convention may seek removal under § 205"). If it is possible for the subject matter of an action to relate to an arbitration agreement even where the defendant is not a party to that agreement, then plainly Section 205 does not limit removal jurisdiction to cases in which the defendant can rely on an agreement to compel arbitration of the plaintiff's claims.

The case law from which *Infuturia* drew its "affect the outcome" standard also makes clear that that standard does not impose the limitations Yu urges. *Infuturia*

18

adopted the standard from the Fifth Circuit's decision in *Beiser*, which similarly held that Section 205 provides a district court with removal jurisdiction over a plaintiff's claims—even if the plaintiff "cannot ultimately be forced into arbitration"—as long as the plaintiff's "suit at least has a 'connection with' the contracts governing the transaction out of which his claims arise." 284 F.3d at 669. In so holding, the *Beiser* court explained that "[w]hatever else the phrase 'relates to' conveys, *it means at least as much as* having a possible effect on the outcome of an issue or decision." *Id.* (emphasis added). *Beiser* thus cannot be read to impose, and *Infuturia* cannot be read to adopt, a standard that would limit Section 205 to cases in which the defendant might compel arbitration of the plaintiff's claims.

The Fifth Circuit's subsequent decisions interpreting *Beiser* highlight that point. In *Acosta*, the court held that claims brought by tort plaintiffs against the insurers of a tortfeasor "related to" arbitration agreements between the insurers and the tortfeasor, even though a state statute allowing for direct actions by the tort plaintiffs against the insurers meant that "whatever is decided in the arbitration proceedings" between the insurers and the tortfeasor "will not affect the outcome of the litigation" between the tort plaintiffs and the insurers. 452 F.3d at 377. The court explained that the "affect the outcome" standard from *Beiser* "was not exhaustive of the cases in which jurisdiction would be appropriate" under § 205, and thus could not be read to deprive the district court of jurisdiction simply because the

19

state statute allowing the tort plaintiffs to bring an action against the insurers might "cancel[] the binding effect of the arbitration clauses" between the insurers and the tortfeasor. *Id.* Rather, because the plaintiffs had brought claims against the insurers for torts that might be covered by the tortfeasor's insurance policy, and because that policy had an arbitration clause, the subject matter of the plaintiffs' claims "related to the arbitration clause as a matter of logic and federal removal law." *Id.* at 379.

Even assuming that *Infuturia* intended to limit Section 205 to circumstances in which the arbitration agreement at issue could "affect the outcome of the plaintiff's case," 631 F.3d at 1138, that standard is met here. The ECIAA clearly could "affect the outcome" of Yu's case, because if the agreement was signed (which it was), then Yu's claim will fail (which it did). *See* 1-ER-13 (dismissing Yu's complaint and declaring that he signed the ECIAA). But *Infuturia*—like *Beiser*— did not intend to impose such a limitation. Where an arbitration agreement provides a defense to a plaintiff's claims, Section 205 will of course provide for removal jurisdiction. But where, as here, a plaintiff seeks a declaratory judgment that an arbitration agreement was never signed and an injunction against enforcement of that agreement, then the subject matter of the plaintiff's claims will also undoubtedly "relate to" that agreement under any conceivable definition of that phrase.

Adopting Yu's theory, moreover, would lead to nonsensical results. Yu maintains that the district court lacked subject matter jurisdiction over his claim

20

seeking a declaration that he never signed the ECIAA and an injunction prohibiting enforcement of the ECIAA. But if BDI had brought a claim seeking a declaration that Yu signed the ECIAA and an order compelling arbitration, there is no question that the court would have had jurisdiction. *See Jones Day*, 42 F.4th at 1138 ("[A] federal court has original jurisdiction over an action or proceeding if two requirements are met: (1) there is an underlying arbitration agreement or award that falls under the Convention, and (2) the action or proceeding relates to that arbitration agreement or award."). Those suits are mirror images of each other. It cannot be that one "relates to" the ECIAA, while the other does not.

## B. The ECIAA Falls Under The Convention

Because the subject matter of Yu's state-court action relates to the ECIAA, removal was proper if the ECIAA is "an arbitration agreement . . . falling under the Convention." 9 U.S.C. § 205. It is. An agreement falls under the Convention if it "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of [the FAA]." 9 U.S.C. § 202. If the agreement "aris[es] out of such a relationship which is entirely between citizens of the United States," then it is deemed not to fall under the Convention unless the "relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." *Id.* Here, the ECIAA arises out of a commercial

21

relationship because it governs Yu's employment with BDI, and Yu's employment with BDI involved interstate commerce in multiple respects. That commercial relationship was not entirely between U.S. citizens, moreover, because Yu was not a U.S. citizen when he signed the ECIAA, and because BDI's affiliates—including its foreign affiliates—were parties to the agreement. And even if the relationship were entirely between U.S. citizens, it would fall under the Convention because it involves property located abroad and has a reasonable relation with one or more foreign states.

### 1. The ECIAA Arises Out Of A Commercial Legal Relationship

As noted, a commercial legal relationship under the Convention "includ[es] a transaction, contract, or agreement described in section 2 of [the FAA]." 9 U.S.C. § 202. Section 2 of the FAA, in turn, applies to arbitration agreements in "contract[s] evidencing a transaction involving commerce." 9 U.S.C. § 2. Yu concedes that "[t]he Supreme Court has interpreted the 'involving commerce' language in Section 2 as being coextensive with 'Congress' Commerce Clause power.'" Opening Br. 28 (quoting *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003)). And that power, as Yu also acknowledges, is "expansive." *Id.* Under the Commerce Clause, "Congress can regulate the channels of interstate commerce," "the instrumentalities of interstate commerce, and persons or things in interstate commerce," as well as "activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545

22

U.S. 1, 16–17 (2005).  Where, as here, an arbitration agreement is contained within an employment contract, the question is whether the employment relationship involves interstate commerce in the broad sense just described.  *See Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 113 (2001) (holding that Section 2 of the FAA covers employment contracts); *Wulfe v. Valero Refin. Co.-California*, 641 F. App'x 758, 760 (9th Cir. 2016) (holding that FAA applies where the "employment relationship . . . involves interstate commerce").

Yu's employment relationship with BDI involved interstate commerce in multiple respects.  Most obviously, it involved "the instrumentalities of interstate commerce."  Yu alleges that he "worked as the head of engineering for the U.S. offices of ByteDance," and that "[h]is scope of work encompassed all video apps at ByteDance, including TikTok, Douyin, and Flipagram."  3-ER-483.[4]  This Court has explained that "the Internet" is "an instrumentality of interstate commerce," *United States v. Tello*, 600 F.3d 1161, 1165 (9th Cir. 2010), as are "[t]elephones" and "software" programs that "directly affect the use of cellular phones," *United States v. Clayton*, 108 F.3d 1114, 1117 (9th Cir. 1997).  Indeed, even Yu concedes (at 31) that "mail, telephone, or electronic systems" are "instrumentalit[ies] of interstate

---

[4] BDI disputes that Yu was the head of engineering for its U.S. offices, but it agrees that he had an engineering role that involved interstate commerce in multiple respects.

23

commerce." Because Yu's alleged job description involved those instrumentalities, it involved commerce within the meaning of the Commerce Clause and Section 2.

The work that Yu alleges he was hired to perform would also have had "a substantial effect on interstate commerce." *Raich*, 545 U.S. at 17. Yu describes TikTok as a leading entertainment platform, "with hundreds of millions of users globally." Opening Br. 7. "Since its launch in 2017, the platform has accumulated over 170 million users in the United States and more than one billion worldwide." *TikTok Inc. v. Garland*, 604 U.S. 56, 63 (2025) (per curiam). And in 2023 alone, "U.S. TikTok users uploaded more than 5.5 billion videos, which were in turn viewed more than 13 trillion times around the world." *Id.* That is "a substantial effect on interstate commerce" under any interpretation.

Yu argues (at 30) that the ECIAA has "an *intra*state footprint and a local focus" because it "provid[es] certain terms regarding a California resident's work at the California headquarters of a California-based corporation," and because it "specifies that it is governed by California law, enforced under California statutes, and requires any arbitration to proceed exclusively in California."[5] But the Supreme Court has made clear that even where activities are "purely local," Congress can regulate them pursuant to its Commerce Clause power if they "are part of an

---

[5] Although BDI has its principal place of business in California, it is incorporated in Delaware. 3-ER-397.

economic class of activities that have a substantial effect on interstate commerce." *Raich*, 545 U.S. at 17 (internal quotation marks omitted). And the Court has held in the context of Section 2 specifically that a contract contemplating local performance will nevertheless fall under the FAA if that performance has an interstate commerce connection. In *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995), for example, the Court held that a termite removal contract between a homeowner and a pest control company involved interstate commerce within the meaning of the FAA—even though the contract contemplated only local performance in Alabama—because the company was "a multistate firm and shipped treatment and repair material from out of state." *Id.* at 269; *see id.* at 282. The employment relationship between Yu and BDI had a far greater interstate connection: Yu was an engineer at a technology company that supports entertainment platforms accessed by millions of users throughout the country.

In any event, nothing in the ECIAA contemplates purely local performance. To the contrary, Yu's trial counsel conceded that Yu "travel[ed] to China in the course of his employment and probably would have done more traveling had he continued to be employed." 2-ER-20. Yu argues (at 30) that "the ECIAA is devoid of any terms that expressly contemplate interstate conduct," but the Supreme Court has held that Section 2 applies to contracts that *involve* interstate commerce, "even if the parties did not *contemplate* an interstate commerce connection," *Allied-Bruce*,

25

513 U.S. at 281 (emphasis added). And regardless, certain terms of the ECIAA do contemplate interstate conduct. As Yu's trial counsel acknowledged, for example, the ECIAA's publicity provision "appl[ies] worldwide" because "[i]t allows ByteDance to . . . publicize [Yu] anywhere in the world." 2-ER-21; *see* 3-ER-535-536.

Yu also asserts that "the ECIAA is not an employment contract" because "[i]t does not contain a salary, bonus, benefits, or job description, let alone employment terms requiring interstate performance." Opening Br. 30 (emphasis omitted). But the ECIAA opens by stating that its purpose is to set forth "condition[s] of [Yu's] employment and certain payments and benefits to be provided to [Yu] by [BDI], which [Yu] acknowledges to be good and valuable consideration for [Yu's] obligations hereunder." 3-ER-529. And it includes material employment terms, like an at-will employment provision, 3-ER-537, and terms regarding publicity, non-disparagement, and confidentiality, 3-ER-529-532, 535-536. Indeed, Yu himself concedes that the ECIAA "imposes standard workplace obligations like confidentiality, non-disparagement, non-solicitation, and at-will employment." Opening Br. 31.

Even if the ECIAA did not include those employment terms, it would still "evidenc[e] a transaction involving commerce," 9 U.S.C. § 2, because it regulates the ownership and disclosure of confidential and proprietary information that affects

26

interstate commerce. The Supreme Court has held that information can qualify as "a thing in interstate commerce," and that the "release of that information in interstate commerce is therefore a proper subject of congressional regulation" under the Commerce Clause. *Reno v. Condon*, 528 U.S. 141, 148 (2000) (internal quotation marks and alteration omitted). Congress has regulated the disclosure of confidential information in a number of areas, including, for example, the trade secret context, where it has authorized a civil action by the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The confidential information governed by the ECIAA includes a number of items— such as "software," "source code," "trade secrets," "algorithms," and "data"—that have a clear interstate commerce connection because they are related to the entertainment platforms that BDI supports and that are used throughout the country. *See Clayton*, 108 F.3d at 1117 ("software" programs that "directly affect the use of cellular phones" are instrumentalities of interstate commerce). Accordingly, even if the ECIAA governed only these items, it would still "evidenc[e] a transaction involving commerce." 9 U.S.C. § 2.

Yu resists the obvious interstate connection of the ECIAA by relying (at 31– 32) on lower federal- and state-court cases that look nothing like this one and that in any event are not binding on this Court. In *Padilla Ayala v. Teledyne Defense*

27

*Electronics*, 533 F. Supp. 3d 920 (C.D. Cal. 2021), for example, the court concluded that an assembly laborer's employment duties did not affect interstate commerce when she performed her duties solely in California and did not use instrumentalities of commerce at all. *See id.* at 926. In *Pineda v. Sun Valley Packing, L.P.*, No. 1:21-cv-01265, 2021 WL 5755586 (E.D. Cal. Dec. 3, 2021), the court held that a seasonal worker at a California packing plant's duties did not affect interstate commerce when her work was solely performed in California. *See id.* at *4. And in *Carbajal v. CWPSC, Inc.*, 245 Cal. App. 4th 227 (2016), the court determined that the duties of an employee at a California painting company did not affect interstate commerce when the employee performed all of her duties within California, and her incidental use of "instrumentalities of interstate commerce"—the telephone—was confined to speaking to intrastate customers. *See id.* at 240. Yu's duties under the ECIAA are not remotely comparable to those of the plaintiffs in *Padilla Ayala*, *Pineda*, and *Carbajal*. Yu himself alleges that he had a senior role at a technology company where he worked on applications that both involved the use of instrumentalities of interstate commerce and had a substantial effect on interstate commerce. And according to his trial counsel, Yu traveled outside of California in the course of his employment and likely would have again in the future had he continued to be employed by BDI. That is worlds away from the intrastate manual laborers in the cases Yu cites, and those cases thus provide no guidance here.

28

### 2. The Legal Relationship Was Not Entirely Between U.S. Citizens

Because the ECIAA arises out of a commercial legal relationship, it falls under the Convention unless that relationship was "entirely between citizens of the United States." 9 U.S.C. § 202. Yu concedes that he was not a citizen of the United States at the time he signed the ECIAA. *See* Opening Br. 32.[6] That exception to the Convention is therefore inapplicable. In addition, because the ECIAA is an agreement between Yu, on the one hand, and BDI "and its affiliates," 3-ER-529, on the other—and because BDI's "affiliates" include its foreign affiliates—the relationship out of which the ECIAA arises is not entirely between U.S. citizens.

Yu says nothing about BDI's affiliates. This Court can reject his argument regarding citizenship on that ground alone. And while Yu argues (at 32) that *he* should be treated as a "citizen" within the meaning of the Convention Act because he "has been a [lawful permanent resident] of the U.S. since 2015," that argument is flawed as well: Section 202 says "citizen," not "lawful permanent resident," and Yu has no basis for asking this Court "to rewrite the statute that Congress has enacted," *Dodd v. United States*, 545 U.S. 353, 359 (2005).

---

[6] Yu represents that he "became a naturalized U.S. citizen earlier this year," Opening Br. 4, but he does not suggest that such a change would retroactively deprive the district court of jurisdiction.

Yu tries (at 32–33) to cobble together a textual basis for his atextual position by pointing to a prior version of the federal diversity jurisdiction statute, which said that "*[f]or the purposes of this section, section 1335, and section 1441*, an alien admitted to the United States for permanent residence *shall be deemed* a citizen of the State in which such alien is domiciled." 28 U.S.C. § 1332(a) (2006) (emphases added).[7] Yu argues (at 32) that "courts have looked to" that since-repealed version "as the best available guide" in interpreting the word "citizen" under the Convention Act. And he asserts (at 33) that "the emerging understanding is that LPRs domiciled in the U.S. qualify as 'citizens' for purposes of the Convention."

The first problem with Yu's argument is that the language he cites has since been deleted from Section 1332(a). To the extent that provision ever shed light on the meaning of 9 U.S.C. § 202—which, as discussed immediately below, it did not— that light has thus been extinguished. Yu argues that the amendment of Section 1332(a) is irrelevant because "Congress repealed the deeming clause only to curb inconsistent judicial decisions—not to cast LPRs as foreign for all purposes." Opening Br. 33 (emphasis omitted). But the House Report Yu cites, to the extent the Court chooses to consider it, is directly to the contrary. *See* H.R. Rep. No. 112-10, at 6–8 (2011).

---

[7] Remarkably, Yu's quotation of that prior version of Section 1332(a) omits the italicized "[f]or purposes of" limitation. *See* Opening Br. 33.

30

There, the Judiciary Committee explained that the language in Section 1332(a) deeming LPRs to be citizens had originally been added "to preclude Federal alienage jurisdiction . . . in suits between a citizen of a state and an alien permanently residing in the same state, thereby also reducing the caseload of the Federal courts." *Id.* at 7. That addition gave rise to problems, however, because it "created an arguable basis for expansion of alienage jurisdiction in other settings." *Id.* For example, "two resident aliens from different states might each be deemed to be a citizen of his or her respective state of domicile and claim access to Federal diversity jurisdiction," despite the Supreme Court's clear pronouncement shortly after the Founding that "[a]lienage jurisdiction exceeds the limits of Article III unless a citizen of the United States also appears as a party." *Id.* at 6–7 (citing *Hodgson v. Bowerbank*, 9 U.S. (5 Cranch) 303 (1810) (Marshall, C.J.)). "To correct the problem," Congress eliminated the language on which Yu relies, so that "resident aliens would no longer be deemed to be U.S. citizens for purposes of diversity jurisdiction, thereby avoiding the possibly anomalous results." *Id.* at 7.

The deletion of the language on which Yu relies thus evinces a clear intent on the part of Congress *not* to treat LPRs as U.S. citizens. Even if the statute had never been amended, moreover, Yu's argument would suffer from the more fundamental problem that Section 1332(a) only ever "deemed" LPRs to be U.S. citizens "[f]or the purposes of this section, section 1335, and section 1441," not for any other

31

purposes, and certainly not for the purpose of 9 U.S.C. § 202. As the Supreme Court has explained, the term "deemed" "is used in legal materials to treat (something) as if it were really something else. Legislators (and other drafters) find the word useful when it is necessary to establish a legal fiction, either by deeming something to be what it is not or by deeming something not to be what it is." *Sturgeon v. Frost*, 587 U.S. 28, 47 (2019) (internal quotation marks, citation, and alterations omitted). A lawful permanent resident is not a U.S. citizen, and although Congress previously treated LPRs to be what they were not for the limited purposes of Sections 1332, 1335, and 1441, it never chose "to establish" that "legal fiction" for jurisdiction under 9 U.S.C. § 202. Yu's position appears to be that Congress, by deeming LPRs to be citizens for a limited jurisdictional purpose, and for a limited period of time, thereby deemed LPRs to be citizens for all jurisdictional purposes, and for all time. That is simply not how deeming provisions (or legislative amendments more generally) work.

The cases on which Yu relies do not compel a contrary conclusion. The two unpublished district court cases that he cites (at 32, 34) are not binding on this Court, and one of those cases relied on the now-repealed deeming clause in Section 1332. *See North Motors, Inc. v. Knudsen*, No. 10-cv-1317, 2011 WL 2552573 (E.D. Mo. June 27, 2011); *Zeng v. Ellenoff Grossman & Schole LLP*, No. 23-cv-10348, 2024 WL 4451605 (S.D.N.Y. Apr. 10, 2024). Nor is Yu helped by the fact that LPRs

32

must register for the draft and pay income taxes, or that they may receive federal financial aid and possess firearms. *See* Opening Br. 34. Indeed, it undermines, rather than supports, Yu's position that other statutes explicitly treat LPRs like citizens, because it illustrates that Congress could have exempted arbitration agreements between citizens and LPRs from the scope of Section 202 but chose not to do so.[8]

Finally, Yu relies (at 35) on two district court decisions for the proposition that an arbitration agreement does not fall under the Convention, even if one of the parties is not a U.S. citizen, if the agreement is not sufficiently foreign in scope. *See Padilla Ayala*, 533 F. Supp. 3d 920; *Pineda*, 2021 WL 5755586. But those decisions are obviously not binding, and this Court should reject them as contrary to the plain text of Section 202, which excludes only certain arbitration agreements that are "entirely between citizens of the United States." 9 U.S.C. § 202; *see Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 339 (5th Cir. 2004) (explaining, with

---

[8] *Industrial Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434 (11th Cir. 1998), *overruled by Corporacion AIC, SA v. Hidroelectrica Santa Rita S.A.*, 66 F.4th 876 (11th Cir. 2023) (en banc), also provides no support for Yu's position. *Contra* Opening Br. 33. The Eleventh Circuit there simply explained that arbitration agreements "not considered as domestic" within the meaning of the Convention include those "involving parties domiciled or having their principal place of business outside the enforcing jurisdiction." 141 F.3d at 1441 (citation and emphasis omitted); *see* Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. I(1), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 4739. The court said nothing about whether the phrase "citizens of the United States" in 9 U.S.C. § 202 includes lawful permanent residents.

respect to an agreement providing for arbitration in a Convention signatory nation, that if "the agreement arises out of a commercial legal relationship," and "a party to the agreement is not an American citizen," then "the Convention requires the district court to order arbitration" (alteration and citation omitted)).

### 3. The Legal Relationship Involves Property Located Abroad And Has A Reasonable Relation With One Or More Foreign States

Even if the ECIAA *were* an agreement "entirely between citizens of the United States," 9 U.S.C. § 202, it would nevertheless fall under the Convention because it arises out of a relationship that "involves property located abroad" and "has some other reasonable relation with one or more foreign states," *id.*

With respect to property, the ECIAA imposes a host of obligations on Yu regarding confidential and proprietary information belonging to BDI "and its affiliates." 3-ER-529. As noted above, BDI's affiliates include its foreign affiliates, meaning that the ECIAA imposes obligations on Yu with respect to intellectual property that those affiliates own abroad. The ECIAA makes clear, moreover, that its provisions apply to property here and abroad: it defines "Intellectual Property Rights" to include all "intellectual property rights and proprietary rights as may exist now or hereafter come into existence, *regardless of whether such rights arise under the laws of the United States or any other jurisdiction*," 3-ER-532 (emphasis added); it requires Yu to "grant[] to Employer *a worldwide . . . right and license . . .* to

34

exploit and exercise" certain intellectual property rights, 3-ER-534 (emphasis added); and it provides for the assignment of intellectual property rights "that may be known as or referred to as 'moral rights' *anywhere in the world*," *id.* (emphasis added). Indeed, Yu's counsel conceded below that the ECIAA "governs confidential information that would be held abroad," because "we're talking about confidential materials or proprietary materials for ByteDance." 2-ER-19-20. The agreement thus plainly arises out of a relationship that "involves property located abroad." 9 U.S.C. § 202.[9]

The relationship out of which the ECIAA arises also "has some other reasonable relation with one or more foreign states." *Id.* In evaluating whether a reasonable relation exists, courts consider the text of an arbitration agreement, but they also look outside "the four corners of the contract." *Soaring Wind Energy, L.L.C. v. Catic USA Inc.*, 946 F.3d 742, 753 (5th Cir. 2020). Courts ask, for example, whether the agreement was negotiated or executed abroad, *see, e.g.*, *Jones v. Sea Tow Servs. Freeport NY Inc.*, 30 F.3d 360, 366 (2d Cir. 1994); *Outokumpu Stainless USA, LLC v. Converteam SAS*, 902 F.3d 1316, 1324 (11th Cir. 2018), *rev'd on other grounds sub nom. GE Energy Power Conversion France SAS, Corp. v. Outokumpu*

---

[9] Yu says (at 36) that "[t]he fact that some company materials may have originated abroad . . . adds no legal significance." If those materials were "property," though, and if they were "involved" in the relationship between Yu and BDI, then the fact that they were "located abroad" certainly adds legal significance; indeed, it is independently sufficient to support application of Section 202.

*Stainless USA, LLC*, 590 U.S. 432 (2020), and whether the agreement has a connection to a domestic signatory's foreign affiliates, *see Soaring Wind Energy*, 946 F.3d at 753. Here, the ECIAA was executed in China, and—as just discussed—it governs the intellectual property rights of BDI's foreign affiliates. Moreover, as Yu's counsel explained in the district court, Yu "travel[ed] to China in the course of his employment," and the ECIAA allowed BDI "to publicize [Yu] anywhere in the world." 2-ER-20-21. Taken together, the connections above are more than sufficient to satisfy the "reasonable relation" test. To quote Yu's trial counsel yet again, "[t]here are lots of components about the ECIAA that . . . are international in nature." 2-ER-19.

Yu argues on appeal that the relationship between the parties lacks the requisite foreign relation because the ECIAA is "an agreement between a U.S. domiciliary and a U.S. corporation"; "applies to Mr. Yu's right to disclose or use certain information and technology learned during his employment in California"; "is labeled For California Employees and repeatedly references California and U.S. law"; and provides that it "shall be governed and interpreted in accordance with the laws of California." Opening Br. 35–36 (internal quotation marks and alterations omitted). As just discussed, however, the ECIAA is an agreement between a Chinese citizen, a U.S. corporation, and that corporation's affiliates, including its foreign affiliates. *See* 3-ER-529. And it applies to "all Confidential Information,"

36

regardless of where that information exists or where Yu learned of it. *See* 3-ER-530. Indeed, "Confidential Information" is defined to include the terms of the ECIAA itself, which Yu presumably learned of when he signed the agreement in China. *See* 3-ER-529. Furthermore, while the ECIAA references California and U.S. law, it also references the laws of "any other jurisdiction," "the laws of any jurisdiction worldwide," and "the laws in the various countries where . . . Moral Rights or . . . other Intellectual Property Rights exist." *See* 3-ER-532, 3-ER-534. And although the ECIAA is governed by California law, a choice-of-law provision is not dispositive in the foreign relation analysis. *See Soaring Wind Energy*, 946 F.3d at 753 (finding foreign relation where agreement was governed by Delaware law).

The cases on which Yu relies are not to the contrary. Yu argues (at 36) that his signing of the ECIAA in China does not supply the requisite foreign relation, and he tries to draw support from the Second Circuit's decision in *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928 (2d Cir. 1983). But *Bergesen* held only that an arbitration award could fall under the Convention even if rendered in the United States. *See id.* at 932–34. It did not hold that an award rendered (or an arbitration agreement signed) outside of the United States could not fall under the Convention. And the Second Circuit's subsequent decision in *Sea Tow Services*—which Yu also cites (at 38)—makes clear that where an agreement is signed *is* relevant to the question whether a foreign relation exists. *See* 30 F.3d at 366 (holding that one of

37

the agreements at issue did not arise out of a relationship that had a reasonable relation with England, where the agreement "was presented to [plaintiff] for signature in the United States").

Nor do the remaining cases that Yu cites—all of which are nonbinding district court decisions—compel a different result. In *Smoller v. Deutsche Bank AG*, No. 06-cv-436, 2006 WL 2129792 (E.D. Mo. July 31, 2006), for example, the court expressly noted that the agreements at issue were "exclusively between citizens of the United States," and that "no basis is provided . . . for third party beneficiaries of the contract." *Id.* at *2 & n.3 (internal quotation marks omitted). The agreements also all appear to have been executed in the United States.[10] Here, by contrast, the ECIAA was executed in China, between U.S. and Chinese citizens, and it provides that "Employer's affiliates are intended beneficiaries of this Agreement." 3-ER-539. *Matabang v. Carnival Corp.*, 630 F. Supp. 2d 1361 (S.D. Fla. 2009), is no better for Yu. The agreement there "was negotiated and signed in Florida," and the parties to the agreement were "both citizens of the United States." *Id.* at 1363–64. The court also held that the agreement "had nothing to do with property," *id.* at 1365, unlike the ECIAA, which involves property located abroad. And although Yu highlights (at 37) the Bahamian connections of the plaintiff's employment in *Matabang*, the

---

[10] The district court in *Smoller* also incorrectly applied the rule that "[r]emoval statutes are strictly construed." 2006 WL 2129792, at *1. As discussed above, that rule does not apply to 9 U.S.C. § 205.

38

court there emphasized that the plaintiff "wasn't even required to set foot on Bahamian soil," and that much of his purported time in the Bahamas was actually spent on "the high seas," which "is arguably not time abroad." 630 F. Supp. 2d at 1366–67 (internal quotation marks omitted).[11]

Yu argues (at 37) that if the ECIAA satisfies the foreign-relation test, then "nearly every domestic employee at a multinational firm could be swept under the Convention's scope." But not all domestic employees sign employment-related agreements in foreign countries, with both their domestic employers and those employers' foreign affiliates, and with agreement terms that govern rights and obligations regarding foreign property. Because Yu did all of those things, his relationship with BDI "involves property located abroad" and "has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202.[12]

---

[11] Furthermore, while the plaintiff in *Matabang* worked on a Bahamian-flagged vessel, the court noted that because the vessel's home port was in Florida, "[i]f the vessel itself were a corporation, it would be deemed a U.S. citizen." 630 F. Supp. 2d at 1367.

[12] Yu argues (at 37) that "the ECIAA is not [his] underlying employment agreement." It is unclear why he thinks that is relevant, given that it satisfies the foreign-relation test for the reasons just discussed. In any event, the ECIAA does cover important aspects of Yu's employment, as already explained, *see* p. 26, *supra*, and as Yu appears to concede immediately after making the statement above, *see* Opening Br. 37 ("the ECIAA governs California-based employment").

* * *

For the foregoing reasons, no persuasive basis exists for holding that the district court lacked jurisdiction or that the terminating sanctions it entered based on Yu's egregious misconduct should be reversed.[13]

## II. This Court Has Jurisdiction Over Yu's Appeal

Finally, there is likewise no merit to Yu's unorthodox argument (at 39–42) that his own appeal is jurisdictionally improper.

The FAA provides that "[a]n appeal may be taken from . . . a final decision with respect to an arbitration that is subject to this title." 9 U.S.C. § 16(a)(3). As the Supreme Court has explained in interpreting Section 16(a)(3), the term "final decision" means "a decision that ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 86 (2000) (internal quotation marks omitted). Here, the district court's order dismissing Yu's complaint and entering default judgment on BDI's counterclaims was a final decision because it ended the litigation on the merits of all of the parties' claims and left nothing more for the court to do but execute the

---

[13] Because the district court had jurisdiction over Yu's ECIAA claim and BDI's ECIAA counterclaim, there is no need for independent analysis of BDI's counterclaims regarding the other agreements. *See* 28 U.S.C. § 1367(a). In any event, the district court plainly had jurisdiction over those counterclaims as well: Even Yu concedes that a claim seeking to compel arbitration "relates to" the asserted arbitration agreement, and the other arbitration agreements all fall under the Convention for the reasons already discussed in connection with the ECIAA.

40

judgment once Yu and BDI finish arbitrating the claims that Yu filed in his separate state-court action.

Yu notes that, under Section 16(b), "an appeal may not be taken from an interlocutory order . . . (1) granting a stay of any action under section 3 of this title . . . [or] (3) compelling arbitration under section 206 of this title."  9 U.S.C. § 16(b); *see* Opening Br. 39–40.  And he tries to draw support from the Supreme Court's decision in *Green Tree*, which held that a district court order compelling arbitration of a plaintiff's claims and dismissing those claims was appealable under Section 16(a)(3).  Yu points to a footnote in *Green Tree* in which the Court observed that the district court's order would not have been appealable if the court had stayed the case rather than dismissing it.  *See* Opening Br. 40 (citing 531 U.S. at 87 n.2).  And he purports to divine from this footnote a "*Green Tree* rule" prohibiting appeals from "an order that compels arbitration and enters a stay."  *Id.*

Yu's purported rule, however, overreads *Green Tree* and runs headlong into this Court's decision in *International Alliance of Theatrical Stage Employee & Moving Picture Technicians, Artists, & Allied Crafts of the United States v. InSync Show Productions, Inc.*, 801 F.3d 1033 (9th Cir. 2015) (*InSync*).  In *InSync*, a union filed a petition to compel arbitration in connection with a collective bargaining agreement, and the district court granted the petition and stayed the case.  *See id.* at 1036.  The employer appealed, and this Court held that it had appellate jurisdiction

41

under both the Labor Management Relations Act and the FAA. *See id.* at 1038–41. With respect to the FAA, the Court concluded that the district court's order was final under Section 16(a)(3)—even though the court had entered a stay—because "the petition to compel arbitration was the only matter before the district court." *Id.* at 1040. The Court distinguished *Green Tree*, explaining that "[t]he limitation on appellate jurisdiction noted in *Green Tree*'s footnote 2 does not apply here because in *Green Tree*, the [defendant] moved to compel arbitration where the plaintiff had alleged substantive claims for relief in her complaint." *Id.*

*InSync* thus differentiates between two categories of cases: those in which the plaintiff has alleged substantive claims for relief, and those that "solely involve[] a claim to compel arbitration in a district court." *Id.* at 1041 n.5. For cases in the first category, an order compelling arbitration and entering a stay is not final within the meaning of Section 16(a)(3) because it does not "end[] the litigation on the merits." *Green Tree*, 531 U.S. at 86 (citation omitted). Rather, the plaintiff's substantive "claim—although currently stayed—remains before the trial court." *InSync*, 801 F.3d at 1041 n.5 (citation omitted). And if the arbitrator determines that some of the plaintiff's claims are not arbitrable, or if the arbitration fails for other reasons, then the district court may need to lift the stay and resolve those claims on the merits. *See, e.g.*, *Tillman v. Tillman*, 825 F.3d 1069, 1076 (9th Cir. 2016).

For cases in the second category, by contrast, an order compelling arbitration and entering a stay "leaves nothing more for the court to do but execute the judgment" after the arbitration is finished. *Green Tree*, 531 U.S. at 86 (citation omitted). There is no circumstance in which the plaintiff's substantive claims will return to the district court, because those claims were never before that court to begin with. Rather, "*all* the judge is retaining jurisdiction for is to allow the arbitrator's award to be confirmed without need for the filing of a separate lawsuit." *InSync*, 801 F.3d at 1040 n.4 (quoting *American Int'l Specialty Lines Ins. Co. v. Elec. Data Sys. Corp.*, 347 F.3d 665, 668 (7th Cir. 2003)). In such a scenario, "the order to arbitrate is final . . . and therefore immediately appealable." *Id.* (citation omitted).[14]

This case falls squarely into the second category. Yu did not bring substantive claims in this litigation. Rather, he brought such claims in two prior state-court

---

[14] This Court's decision in *Dees v. Billy*, 394 F.3d 1290 (9th Cir. 2005), is not to the contrary. *See* Opening Br. 40 (citing *Dees*). The plaintiff there brought a malpractice claim, and the district court compelled arbitration and stayed the action. *Dees*, 394 F.3d at 1291. The plaintiff appealed, and this Court held that it lacked jurisdiction because the district court had "entered a stay instead of a dismissal." *Id.* at 1294 (quoting *Green Tree*, 531 U.S. at 87 n.2). In so holding, the Court distinguished cases in which courts had found jurisdiction over an appeal from an order compelling arbitration without entering a dismissal, explaining that in those cases, the plaintiff "sought only to obtain an order compelling arbitration," whereas in *Dees*, the district court "had more before it than simply the issue of arbitrability." *Id.* at 1293 (citing *American Heritage Life Ins. Co. v. Orr*. 294 F.3d 702 (5th Cir. 2002)). *Dees* therefore does not cast doubt on this Court's jurisdiction in cases, like this one, that involve only "the issue of arbitrability." *See InSync*, 801 F.3d at 1041 n.5 (distinguishing *Dees* on these grounds).

43

actions, the first of which was dismissed for failure to prosecute, and the second of which remains pending in state court. *See* 2-ER-240; 2-ER-273. This case—in sharp contrast to Yu's prior actions—involves only Yu's claim that he did not sign the ECIAA, *see* 3-ER-485, and BDI's counterclaims that Yu signed and is required to arbitrate his state law claims pursuant to the ECIAA and the other three agreements, *see* 3-ER-402-406. If BDI had brought its counterclaims as a standalone action seeking to compel arbitration, an order compelling arbitration and staying the case would unambiguously have been appealable under *InSync*. The only question is whether the presence of Yu's claim that he did not sign the ECIAA somehow renders the district court's order interlocutory. It does not. Yu's ECIAA claim was not referred to arbitration, and nothing an arbitrator says will have any bearing on the district court's determination that Yu signed the ECIAA and is required to arbitrate his state-court claims pursuant to that agreement. *See* 1-ER-13. Once the parties are finished arbitrating Yu's substantive claims and return to the district court, there will be "nothing more for the court to do but execute the judgment" with respect to Yu's federal-court claim and BDI's counterclaims. *Green Tree*, 531 U.S. at 86 (citation omitted). The district court's order is thus final and appealable under Section 16(a)(3).[15]

---

[15] The district court may also be asked to entertain an application to confirm, vacate, or modify the arbitration award. *See* 9 U.S.C. §§ 9–11. As just discussed, however,

44

**CONCLUSION**

For the foregoing reasons, the district court's decision should be affirmed.

Dated:  October 24, 2025

Respectfully submitted,

/s/ Gregory G. Iskander

Gregory G. Iskander
LITTLER MENDELSON, PC
1255 Treat Boulevard, Suite 600
Walnut Creek, CA  94597
(925) 927-4543
giskander@littler.com

Demery E. Ryan
Alexandra Bernstein
LITTLER MENDELSON, PC
2049 Century Park East, 5th floor
Los Angeles, CA  90067
(310) 772-7248

*Counsel for Appellee*
*Shuyi (Selene) Gao*

/s/ Benjamin W. Snyder

Benjamin W. Snyder
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC  20036
(202) 551-1700
bensnyder@paulhastings.com

Elena R. Baca
Felicia A. Davis
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
(213) 683-6000

Ben Gifford
PAUL HASTINGS LLP
200 Park Avenue
New York, NY  10166
(212) 318-6000

*Counsel for Appellee ByteDance Inc.*

---

such a request does not render nonfinal the court's prior order.  *See InSync*, 801 F.3d at 1040 n.4.  Nor does BDI's intention to re-file its sanctions motion against Yu's trial counsel.  *See* SER-4-7.  There is no possibility that the court's disposition of that motion will affect its prior order, and "[a] question remaining to be decided after an order ending litigation on the merits does not prevent finality if its resolution will not alter the order or moot or revise decisions embodied in the order." *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199 (1988).

45

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-297

I am the attorney or self-represented party.

**This brief contains** 11,151 **words, including** 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( ● ) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated _____.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Benjamin W. Snyder **Date** October 24, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 24, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ Benjamin W. Snyder*
Benjamin W. Snyder